# IN THE SUPREME COURT OF TEXAS

════════════
No. 13-0986
════════════

SOUTHWESTERN ENERGY PRODUCTION COMPANY, PETITIONER,

v.

TOBY BERRY-HELFAND AND GERY MUNCEY, RESPONDENTS

═══════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS
═══════════════════════════════════════════════════════

**Argued October 13, 2015**

JUSTICE GUZMAN delivered the opinion of the Court.

In this trade-secret misappropriation case, a jury found an oil-and-gas operator misused proprietary information acquired under a confidentiality agreement and profited handsomely from its use. The trade secrets at issue purported to identify ten localized areas in East Texas oil-and-gas formations offering optimized production from both a relatively untapped geologic reservoir and deeper strata with more established production (multiple stacked-pay potential). The jury valued the trade-secret information at $11.445 million and awarded that amount as both tort damages for misappropriation and contract damages for breach of the confidentiality agreement. Though not stated as a percentage, the damages are equal to three percent of $381.5 million—the past production revenue generated by wells the operator drilled in the target areas. In addition to actual damages assessed by the jury, the trial court awarded $23.89 million in equitable disgorgement of past profits. The court of appeals affirmed the actual-damages award for misappropriation, but reversed and

rendered a take-nothing judgment on the breach-of-contract and disgorgement awards. 411 S.W.3d 581, 614 (Tex. App.—Tyler 2013).

In cross appeals to this Court, the primary issues are (1) sufficiency of the evidence to support the jury's actual damages awards, (2) whether limitations bars the misappropriation claim as a matter of law, and (3) availability of equitable disgorgement for misappropriation and breach of a non-fiduciary duty of confidence. Reviewing the record in the light most favorable to the jury's verdict, we conclude the record bears evidence of actual damages, the evidence is legally insufficient to sustain the entire jury award, and limitations is not conclusively established. We therefore reverse and remand the breach-of-contract and misappropriation-of-trade-secret claims for a new trial. We do not address the equitable-disgorgement issue because the trial court may balance the equities differently following a new trial.

## I. Background

Toby Berry-Helfand, an experienced reservoir engineer, worked full time for nearly seven years analyzing data on East Texas oil-and-gas formations to identify locations in the James Lime reservoir where gas production could be enhanced with horizontal drilling designed to intersect and drain multiple fractures while optimizing the potential for payout from the James Lime and deeper production zones.[1] At the time Helfand's work commenced, industry interest in the James Lime was anemic because commercially viable methods of developing the field were lacking. Helfand intended to leverage advancements in horizontal drilling techniques and target stacked-pay drilling prospects that would reduce development costs and make James Lime exploration more efficient,

---

[1] Depositional strata below the James Lime include the Pettet, Travis Peak, Cotton Valley, and Haynesville/Bossier.

2

economical, and enticing. The objective was to pinpoint the "sweet spots" for drilling and producing from the James Lime with multiple stacked payout. Helfand's business plan was to market the idea as a "play," a large-scale campaign of mineral leasing and exploration focused on those specifically delineated areas.

Helfand's research encompassed 2.75 million acres across five counties and consumed thousands of hours spent analyzing "every shred" of publicly accessible well data and historical production records from every well in the five-county area, including a handful of successful James Lime vertical wells. Helfand meticulously recorded the fruits of this endeavor, creating a uniquely comprehensive study and annotated map of the James Lime's production potential in Angelina, Cherokee, Nacogdoches, Shelby, and San Augustine counties.

Over the years, Helfand collaborated with two geologists on the undertaking: Gery Muncey, who worked with Helfand from 1998 to 2001, and Leon Wells, who worked with Helfand from 2003 to 2005. With their assistance, Helfand created a "treasure map" of the best localized spots for drilling the James Lime formation in East Texas, ultimately identifying ten sweet spots. According to Muncey, the sweet-spot areas were limited to 30,000 acres, which is about 1% of the acreage under study.[2]

Helfand's drilling methodology was not limited to locating sweet spots; she also advocated a preferred method for exploiting the reservoir without damaging it. For optimal results, Helfand recommended drilling a pilot hole and using log data to narrow a zone for development using an underbalanced-horizontal-drilling technique.

---

[2] At trial, Helfand testified the defined areas were approximately 5 miles in diameter and considerably more than 30,000 acres. Based on our independent calculations, the area in ten circles with 5-mile diameters would be roughly 126,000 acres or 4.6% of the acreage Helfand studied.

Helfand's sweet-spot methodology was first put to the test in 2000 when Helfand and Muncey partnered with David Michael Grimes and Grimes Energy to drill the Chandler #1 well in the Black Bayou prospect of Nacogdoches County. The well was not successful. According to Helfand, Grimes shut in the well after production was thwarted by improper testing methods.

Muncey and Helfand parted ways the following year, but he maintained contact with her and retained a 20% interest in the James Lime information and methodology. Helfand continued to pursue the James Lime play on her own until Wells offered his assistance in 2003. Operating as "Team Works," Helfand and Wells refined the James Lime methodology with further data and analysis, including information obtained from nearly 150 James Lime horizontal wells.

In 2004, Helfand and Wells decided to generate interest in the James Lime play by acquiring a drill-ready prospect as a sample of their inventory and then marketing the prospect to exploration companies with deep pockets and the technical ability to properly develop other sweet spots. After evaluating and prioritizing a number of drilling sites with stacked-pay potential, Helfand and Wells selected two Nacogdoches County prospects, Pearson and Pearson Northeast, that had a number of "positive features"—favorable geologic structure for James Lime development, adjacent James Lime production, existing or prior production in two deeper zones (the Travis Peak and Pettet), wells that had penetrated two additional zones (Cotton Valley and Haynesville/Bossier) with strong hydrocarbon indications, plenty of leasable acreage, and ready access to existing pipelines. With financing from several investors, Helfand secured the Pearson prospects by obtaining leases covering 6,300 acres and all depths.

In presentations to a number of industry players, Team Works pitched the Pearson prospects as part of a larger play. The dispute in this case arises from Team Works's February 2005

4

presentation to Southwestern Energy Production Co. (SEPCO), which was facilitated by Wells's son, a reservoir engineer employed by SEPCO.

At the time of the presentation, SEPCO had not acquired any mineral leases with James Lime as the primary drilling objective, had never drilled a James Lime well, had been dissuaded from pursuing James Lime ventures by an internal study conducted in 2003, had declined to participate in a James Lime play with Sonerra Resources in 2003, and had zero horizontal wells. SEPCO had drilled only one well in the vicinity of the Pearson prospects (Reavley #1), which was a Travis Peak well, and had previously purchased a single James Lime vertical well (Lois Foster Blount #1). By all accounts, before the Team Works presentation, SEPCO had not acquired sufficient information to engage in a large-scale James Lime play.

Despite SEPCO's apparent indifference to James Lime development, Wells's son found the play "interesting" and, in an email exchange predating the presentation, told his father that SEPCO was "working the same area (many of the same fields)—just that we are targeting some deep ideas," and even though SEPCO had "not considered [the James Lime] at all . . . , given the size potential and the proximity to other ideas/acreage that [SEPCO was] pursuing," SEPCO would "definitely want to look at this [James Lime play]." Helfand, who was not privy to the email exchange, was evidently unaware SEPCO was a potential competitor and did not know SEPCO had executed an unrecorded joint exploration agreement with another operator—Endeavor Natural Gas L.P.—covering 360 square miles in Angelina, Cherokee, and Nacogdoches counties, with borders in close proximity to the Pearson prospects and encompassing several sweet-spot areas. SEPCO's representatives perceived no obligation to disclose the joint exploration agreement to Team Works prior to or after the February 2005 presentation.

5

Before Team Works disclosed any information, however, SEPCO executed a confidentiality and noncompete agreement that required SEPCO to maintain the information's confidentiality, use it solely to evaluate the Pearson prospects for purchase from or development with Team Works, and "promptly return or, upon request by TEAM WORKS, destroy the original and all copies of the Confidential Information" if the parties failed to reach a written agreement for SEPCO to purchase or develop the properties.[3] SEPCO also agreed not to compete with Team Works in a specified area of mutual interest for one year.[4] If SEPCO acquired any lease or other interest during the one-year term, SEPCO was required to notify Team Works, and Team Works had a preferential option to acquire the interest.[5]

After SEPCO executed the confidentiality and noncompete agreement, Team Works provided detailed information about the Pearson prospects and identified sweet-spot prospects throughout the

---

[3] Paragraph 2 of the confidentiality agreement provides: "Company [SEPCO] hereby agrees that all of such Confidential Information has been provided to Company in consideration of, and subject to, Company's maintaining its confidentiality and agrees to use the Confidential Information solely for the evaluation of the Properties for purchase from or development with TEAM WORKS. Company further agrees that it will not disclose any Confidential Information to any third parties except for independent consultants retained by Company for assistance in analysis and interpretation of Confidential Information on behalf of Company, without the written consent of TEAM WORKS." "Confidential Information," is defined as "all information and data furnished to Company by TEAM WORKS, its affiliates or representatives, and any information obtained from any on-site inspections of the Properties by Company or from any third-party operators, to the extent the same relates to the Properties and is either confidential, proprietary or otherwise not available to the public . . . ," subject to exceptions for public information, information already known to SEPCO, information provided by a third-party not prohibited from communicating the information, and information SEPCO is compelled by law to disclose.

[4] The noncompete agreement in paragraph 3 of the agreement states: "During the term of this Agreement, Company agrees not to acquire, or cause to be acquired an interest through trade, purchase, farmin, or any other means in any of the lands or leases within the area identified on Attachment 'A' as the Properties unless it acquires such interest through TEAM WORKS." The term of the agreement is defined in paragraph 6: "Notwithstanding anything stated herein to the contrary, this Agreement shall terminate and be of no further force and effect twelve (12) months following the Effective Date, unless terminated sooner by mutual agreement of the parties hereto."

[5] The priority option was outlined in paragraph 7, as follows: "Should Company acquire any lease(s) or other interest(s) by means of a lease, purchase, assignment, trade, farmin, sublease or other form of acquisition within twelve (12) months from the date hereof; Company shall promptly give TEAM WORKS notice of such acquisition. TEAM WORKS shall have a preferential right to acquire, at the same price and/or terms as acquired by Company, on all, at TEAM WORKS's option, of Company's rights to such leases or other interests."

play.  The presentation materials emphasized the stacked-pay potential of the James Lime, Pettet, Travis Peak, and Cotton Valley formations.  SEPCO was represented at the meeting by geologist Matt Williams, reservoir engineer Doug Van Slambrouck, and landman Jon Pruet.

Within days after the meeting, SEPCO negotiated an exclusive evaluation period through April 1, 2005.  During that period, Team Works provided additional data and maps at SEPCO's request, while SEPCO reportedly evaluated the deal's economic viability.  But time passed with no offer from SEPCO, and Helfand became increasingly frustrated.  When SEPCO's exclusivity period expired, Helfand began marketing the play to other companies.

According to Pruet, SEPCO was unusually slow in making a decision about the deal, and if SEPCO had any interest in making an offer to Team Works, it would have done so within thirty days.  Because the deal purportedly failed SEPCO's economic criteria, SEPCO never extended an offer to Team Works.  But rather than rejecting the proposal outright, SEPCO retained Team Works's information and data until Helfand requested its return in early May 2005.  Though Helfand remained hopeful about making a deal with SEPCO, she needed the materials to prepare a presentation for Petrohawk Properties, L.P.

SEPCO returned documents to Helfand in two batches; the second followed Helfand's complaint that SEPCO had not returned all the materials Team Works had entrusted to SEPCO.  Although Pruet and Wells separately assured Helfand that the follow-up package included all the remaining information, Van Slambrouck actually retained materials in his files until he discarded the information sometime before 2008.

On July 1, 2005, nearly two months after Helfand's pitch to Petrohawk, the parties closed a deal.  Petrohawk purchased the Pearson prospects from Helfand for $1.8 million, an overriding

royalty interest, and a 6.25% after-payout ("back-in") working interest.[6] Helfand and Petrohawk also executed a Prospect Identification Agreement covering Angelina, Nacogdoches, and Shelby Counties. During the agreement's twelve-month primary term, Petrohawk agreed to pay Helfand $15,000 per month for six months as a retainer fee for technical consulting and prospect-generation services. If Petrohawk elected to participate in a prospect Helfand substantiated, she was entitled to a prospect fee based on the mineral acres leased, a sliding-scale overriding royalty interest determined by the total royalty burden, and an optional back-in working interest. For prospects that Petrohawk identified on its own within a defined area of mutual interest, Helfand only had the option to acquire a 6.25% working interest in the initial test well.

Under the Petrohawk agreement, Helfand averaged a 3% overriding royalty on "hundreds and hundreds" of leases for the Pearson prospects. In other dealings under the agreement, Petrohawk purchased a Waterman prospect and a Timpson/Tenaha well from Helfand and, at her direction, acquired holdings in the Waterman, Waterman Extension, Black Bayou, and Timpson/Tenaha prospects. The compensation Helfand realized for transactions other than the Pearson prospects is not addressed in the record.

While Helfand was engaged with Petrohawk, SEPCO embarked on a James Lime play of its own. As early as March 11, 2005, SEPCO's internal drilling documents identified the James Lime as a "primary" drilling objective. After ostensibly returning Helfand's data, SEPCO launched an aggressive acquisition of lease interests and actively pursued drilling in the areas Helfand had identified as sweet spots. During the one-year noncompete period, SEPCO obtained interests in

---

[6] Helfand and Wells ended their association somewhat acrimoniously around the time of this transaction. Litigation later ensued concerning Wells's share of the Petrohawk deal for the Pearson prospects, and that lawsuit was settled on terms that are not material to this case.

8

hundreds of leases in the target areas, including Pearson leases, but did not provide Helfand with notice of those acquisitions, claiming the contractual notice requirement was limited to the areas of mutual interest described in the confidentiality and noncompete agreement. In November 2005, Matt Williams completed a structure map of the James Lime with trend lines correlating to the data Team Works provided at the February 2005 presentation. The map appeared to bear subtle pen or pencil markings distinctly tracing trend-line and sweet-spot notations Helfand had identified.

In August 2007, SEPCO executed a "James Lime Exploration Agreement" with Thomas Harman, James Culver, and their related entities, and in October of that year, drilled its first James Lime horizontal well. The process of evaluating a prospect to commencing active-drilling operations typically takes from one to two years.

By the fall of 2010, SEPCO had acquired 1,888 leases and drilled more than 140 wells—88 of them James Lime horizontal wells—in areas clustered around the sweet spots Helfand had identified. Although the sweet-spot acreage was vast, it represented only a small fraction of the trend's acreage and "virtually all" of SEPCO's leases or wells were in those areas. And, surprisingly, there was no lemon in the bunch. In fact, SEPCO's wells had a one-hundred-percent success rate and generated an undisputed $381.5 million in production revenue. Matt Williams and Doug Van Slambrouck were instrumental to the success of SEPCO's James Lime play.

While SEPCO was occupied pursuing the James Lime, Helfand was engaged in litigation over alleged misuse of her proprietary information with respect to other drilling operations in the East Texas James Lime fairway. In 2006, Helfand sued Wells, Endeavor, Grimes, Harman, Culver, and several affiliated parties as co-conspirators. Muncey intervened, claiming an interest in the trade secrets and adopting Helfand's pleadings. In 2008, Helfand added new claims for misappropriation

and theft of trade secrets to her initial claims of fraud, conversion, breach of fiduciary duty, and breach of contract.

In November 2008, Harman and Culver attempted to designate SEPCO as a responsible third party, but Helfand resisted those efforts. In February 2009, however, Helfand sued SEPCO for misappropriating trade secrets, breaching the confidentiality agreement, fraud, breach of fiduciary duty, and statutory theft of trade secrets. Helfand claims she uncovered SEPCO's illicit activities through discovery in the existing litigation.

All defendants settled before the November 2010 trial except Wells and SEPCO. The only claim against Wells that was tried to the jury was a fraud claim. The jury absolved Wells of liability, and he is not a party to this appeal.

SEPCO did not fare as well. At trial, SEPCO attributed its James Lime success to independent efforts, disputed having access to information from Helfand that would have identified the sweet spots, denied that the sweet spots were discrete enough to create an inference of misappropriation, and claimed that some of the disputed wells might have been drilled to prevent drainage. SEPCO emphasized that it had ongoing operations in East Texas before the February 2005 presentation; it had engaged in extensive Travis Peak drilling that provided information about uphole strata; and neither the James Lime nor horizontal-drilling techniques were secret. Although the evidence of misappropriation was hotly contested, the jury was unpersuaded by SEPCO's account and found SEPCO liable on all claims. Accordingly, we have recounted the evidence in the light most favorable to the jury's verdict, as we must. *See Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

10

With respect to damages, the jury valued the trade secrets at $11.445 million and found SEPCO's "benefits, profits, or advantages" from the trade secrets were $11.445 million in the past and $0 in the future. The actual damages awarded were equivalent to 3% of the $381.5 million in "profits made by [SEPCO] as a result of the misappropriation of the trade secrets," which corresponded to uncontroverted evidence of nearly $382 million in past production revenue (excluding taxes and monthly operating expenses) from the disputed wells. The jury charge employed the same "value of the trade secret" measure of damages for Helfand's breach-of-contract, breach-of-fiduciary-duty, theft, and fraud claims; consequently, the jury also awarded $11.445 million in damages for each of those claims. The jury did not award exemplary damages.

Post-verdict, the trial court ordered an accounting and, in the final judgment, rendered judgment on the jury's verdict and awarded an additional $23.89 million in equitable disgorgement of profits. The final judgment against SEPCO totaled more than $40 million, including $4.6 million in attorney's fees and pre- and post-judgment interest.

In six multifarious appellate issues, SEPCO challenged the sufficiency of the evidence to sustain the jury's liability and damages findings, the jury's finding that Helfand did not discover her claims until January 2009, exclusion of Helfand's prior pleadings against the settling defendants, several aspects of the jury charge, and the equitable disgorgement award. In a conditional cross-appeal, Helfand and Muncey argued the disgorgement award was too low because SEPCO's accounting was fundamentally flawed and understated SEPCO's illicit gain.

The court of appeals reversed and rendered a take-nothing judgment on the breach-of-fiduciary-duty, fraud, breach-of-contract, and theft-of-trade-secret claims on evidentiary grounds; held equitable disgorgement was not available as a matter of law because SEPCO did not

11

owe Helfand a fiduciary duty; rejected SEPCO's challenges to the jury charge and the exclusion of Helfand's prior pleadings; affirmed the $11.445 million actual damages award for misappropriation of trade secrets; and remanded the case to the trial court for an award of attorney's fees to SEPCO as the prevailing party on the statutory theft claim.

SEPCO filed a petition for review, and Helfand and Muncey filed a conditional cross-petition. The liability findings are not contested for purposes of this appeal. Broadly stated, the questions presented are (1) whether legally sufficient evidence supports the jury's award of actual damages for trade-secret misappropriation; (2) whether SEPCO conclusively established that Helfand filed suit more than three years after her injury was discoverable and, if so, whether an exception applies; (3) whether the trial court abused its discretion in excluding evidence and testimony about Helfand's prior pleadings; (4) whether the charge is fatally defective due to faulty or omitted instructions; (5) whether the court of appeals erroneously reversed and rendered judgment in SEPCO's favor on the breach-of-contract claim based on legally insufficient evidence of damages; and (6) whether equitable disgorgement is a viable remedy absent a fiduciary relationship.

## II. Discussion

### A. Actual Damages

A "flexible and imaginative" approach is applied to the calculation of damages in misappropriation-of-trade-secrets cases. *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). Damages in misappropriation cases can therefore take several forms, including the value of the plaintiff's lost profits, the defendant's actual profits from the use of the secret, the value a reasonably prudent investor would have paid for the trade secret, the development

costs the defendant avoided by the misappropriation, and a reasonable royalty.[7] *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012). "[E]ach case is controlled by its own peculiar facts and circumstances." *Univ. Computing*, 504 F.2d at 538 (quoting *Enter. Mfg. Co. v. Shakespeare Co.*, 141 F.2d 916, 920 (6th Cir. 1944)).

Loss of value to the plaintiff is usually measured by lost profits. *See, e.g.*, *Bohnsack*, 668 F.3d at 280; *Jackson v. Fontaine's Clinics, Inc.*, 499 S.W.2d 87, 89-90 (Tex. 1973); *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204, 214 (Tex. App.—Dallas 1973, writ ref'd n.r.e.). To recover lost profits, a party must introduce "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Reasonable certainty is required to prove lost profits. *E.g.*, *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002).

Value to the defendant may be measured by the defendant's actual profits resulting from the use or disclosure of the trade secret (unjust enrichment), the value a reasonably prudent investor would have paid for the trade secret, or development costs that were saved. *Univ. Computing*, 504 F.2d at 536, 538-39; *Precision Plating & Metal Finishing Inc. v. Martin Marietta Corp.*, 435 F.2d 1262, 1263-64 (5th Cir. 1970); *Elcor Chem. Corp.*, 494 S.W.2d at 214.

Absent proof of a specific injury, the plaintiff can seek damages measured by a "reasonable royalty." *Metallurgical Indus., Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986); *Univ. Computing*, 504 F.2d at 536-39. "[B]ecause the precise value of a trade secret may be difficult to determine, 'the proper measure is to calculate what the parties would have agreed to as a fair price

---

[7] For claims accruing on or after September 1, 2013, the Texas Uniform Trade Secrets Act governs. *See* TEX. CIV. PRAC. & REM. CODE § 134A.001-.008. Remedies available under the Act include injunctive relief; damages measured by actual loss plus unjust enrichment not included in computing actual loss; a reasonable royalty; and exemplary damages capped at two times actual damages. *Id.* §§ 134.003, .004.

for licensing the defendant to put the trade secret to the use the defendant intended at the time the misappropriation took place.'" *Mid-Michigan Comput. Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510-11 (6th Cir. 2005). The royalty is calculated based on a fictional negotiation of what a willing licensor and licensee would have settled on as the value of the trade secret at the beginning of the infringement. *Metallurgical Indus.*, 790 F.2d at 1208; *Univ. Computing*, 504 F.2d at 540. A reasonable royalty is, in essence, a proxy for the value of what the defendant appropriated, but it is not simply a percentage of the defendant's actual profits. *See Metallurgical Indus.*, 790 F.2d at 1208; *Univ. Computing*, 504 F.2d at 537.

In some cases, damages may be ascertained with precision, either because the parties previously agreed on the value or an industry standard provides a clear measure. *Univ. Computing*, 504 F.2d at 538-39. But lack of certainty does not preclude recovery. *Id.* at 539 ("Where the damages are uncertain, however, we do not feel that the uncertainty should preclude recovery; the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown."). The fact finder must have sufficient evidence to determine the value a reasonably prudent investor would pay for the trade secret, *Bohnsack*, 668 F.3d at 280, and to meet that standard, the plaintiff need only demonstrate "the extent of damages as a matter of just and reasonable inference," even if the extent is only an approximation, *DSC Comm's Corp. v. Next Level Comm's*, 107 F.3d 322, 330 (5th Cir. 1997).

Damage estimates, however, cannot be based on sheer speculation. *Metallurgical Indus.*, 790 F.2d at 1208. "If too few facts exist to permit the trier of fact to calculate proper damages, then a reasonable remedy in law is unavailable." *Id.*; *cf. Burbage v. Burbage*, 447 S.W.3d 249, 260 (Tex. 2014) ("We require *some* concrete basis for an estimate.").

14

The charge here included both value-to-the-defendant and reasonable-royalty measures of damages for misappropriation of trade secrets. The jury found as follows:

1.    The "benefits, profits, or advantages" gained by SEPCO in use of the trade secrets:

    (1) in the past:      Answer:      $11,455,000
    (2) in the future:    Answer:      $0

2.    The value of the trade secret: $11,455,000

In effect, the jury determined the value to the defendant in the past was equivalent to the "value of the trade secret,"[8] which was defined in the charge as:

an estimate of the amount that a person desiring to use the trade secret would be willing to pay for its use and a trade secret owner desiring to license the trade secret would be willing to accept, if neither party were compelled to do so. In determining the value of a trade secret, you may consider such factors as:

(i) the resulting and foreseeable change in the parties' competitive posture as a result of the misappropriation of the trade secret;

(ii) the prices past purchasers or licensees of the trade secret may have paid;

(iii) the total value of the secret to the owner, including their development costs and the importance of the secret to the owner's business;

(iv) the nature and extent of the use the defendant intended for the secret; and

(v) whatever other unique factors in the particular case might have affected the parties' agreement, had they negotiated and agreed on a reasonable value, such as the ready availability of alternative processes.

The jury also found "the amount of profits made by [SEPCO] as a result of the misappropriation of trade secrets" to be $381.5 million, which corresponds to uncontroverted evidence of the past production revenue attributable to the disputed wells and the amount to which an overriding royalty,

---

[8] The record reflects that the term "value of the trade secret" was used in lieu of "reasonable royalty" to avoid confusion with oil and gas royalties.

15

if any, would be applied.  The damages awarded by the jury under the value-to-the-defendant and reasonable-royalty measures equate to 3% of this amount.

On appeal, SEPCO argues the evidence is legally insufficient to sustain the jury's finding of $11.445 million in damages.  SEPCO contends the testimony of Helfand and Muncey's expert was unreliable, should have been excluded, and is therefore no evidence to support the damages awarded. Helfand and Muncey counter that the expert's testimony was sufficiently reliable; SEPCO failed to object to the expert's testimony; and even if the expert's testimony fails, the record bears more than sufficient evidence of $11.445 million in actual damages.

We measure evidence sufficiency against the factors submitted in the charge to determine whether evidence supports both the existence of damages and the amount awarded.  *See, e.g.*, *Univ. Computing*, 504 F.2d at 539 (listing factors the trier of fact should consider in calculating a fair licensing price); *see also Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex. 2010); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71-72 (Tex. 2000); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996).  Evidence is legally insufficient when (a) evidence of a vital fact is completely absent; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact.  *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005).  When determining whether the jury had a sufficient evidentiary foundation on which to base its damages award, we are "limited to reviewing only the evidence tending to support the jury's verdict and must disregard all evidence to the contrary," *Mancorp, Inc. v. Culpepper*, 802 S.W.2d

226, 227 (Tex. 1990), except contrary evidence that is conclusive, *City of Keller*, 168 S.W.3d at 817. The jury generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002).

**1. Evidence Bearing on "Value of the Trade Secret"**

Helfand testified she spent years working to identify the best locations to produce from the James Lime using horizontal underbalanced drilling to achieve production from other zones—multiple stacked payout. She spent thousands of dollars to acquire the data she analyzed and used to produce a map that delineated sweet-spot locations. Through her efforts, she purported to reduce the potential area of exploration and development from millions of acres to thousands. After acquiring access to Helfand's research and analysis under a confidentiality agreement, SEPCO drilled more than 140 wells, including 88 James Lime wells, in eight prospect areas correlated to Helfand's "sweet spots." All of the wells were successful. The jury found this remarkable achievement was facilitated by SEPCO's misappropriation of Helfand's confidential trade-secret information. Past production revenues on the wells SEPCO drilled amounted to nearly $382 million. Although the wells included in the damages model were disputed, the production revenue attributable to those wells was not. Because SEPCO had insufficient information to pursue such an ambitious endeavor before acquiring Helfand's proprietary information, SEPCO's subsequent pursuit of more than 140 successful wells is evidence of "the nature and extent of the use the defendant intended for the secret."

To show actual damages of at least 3% of the past production revenues, Helfand and Muncey primarily relied on the terms of Helfand's "Prospect Identification Agreement" with Petrohawk, which involved the same trade secrets at issue in this case. The agreement was executed in the same

17

general time frame as Helfand's dealings with SEPCO, implicated the same geologic area and attributes, and included three of the five counties encompassed by Helfand's research. The primary term of the contract was twelve months, and Petrohawk was obligated to pay Helfand $15,000 per month to provide technical consulting and prospect-generation services to Petrohawk during a six-month retainer period that could be extended for an additional six months. In addition, if Petrohawk elected to participate in a prospect Helfand identified, she was entitled to (1) a $20 per-net-mineral-acre bonus capped at $100,000 for each prospect, (2) an overriding royalty interest determined by the total royalty burden (excluding the prospect overriding royalty interest), and (3) a 6.25% back-in working interest. If the royalty burdens for the prospect equaled or exceeded 25%, the prospect overriding royalty would be zero. If the royalty burdens were less than 25%, the prospect overriding royalty would slide based on the total royalty burden, ranging from a minimum of 25% *minus* the total royalty burden to a maximum of 3% *plus* one-half the difference between existing burdens and 20%.[9] The prospect acreage-bonus fee and back-in working interest were unaffected by the royalty burden.

Helfand testified that, in her course of dealings with Petrohawk, she averaged a 3% overriding royalty on hundreds of mineral leases supporting the Pearson prospects. Although Helfand did not testify the terms and rates in the Petrohawk agreement were "reasonable and

---

[9] An overriding royalty interest is a fraction of gross production that does not affect mineral owners because it is carved out of the working interest. *See McDonald v. Follett*, 180 S.W.2d 334, 336 (Tex. 1944); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 599 n.2 (Tex. App.—Austin 2000, pet. denied) (an overriding royalty is "a fractional interest in the 'gross production of oil and gas under a lease, in addition to the usual royalty paid to the lessor, free of any expense for exploration, drilling, development, operating, marketing, and other costs incident to the production and sale of oil and gas produced from the lease'" (quoting 8 WILLIAMS & MEYERS, OIL & GAS LAW 748 (1999)). A "working interest" is an operating interest under an oil and gas lease that bears all the costs of production and is held subject to the payment of royalties. *H.G. Sledge, Inc.*, 36 S.W.3d at 599 n.3. The lessee's share of production after satisfaction of all burdens, such as royalties and overriding royalties, have been deducted from the working interest is referred to as the "net revenue interest." 8 WILLIAMS & MEYERS, OIL & GAS LAW, MANUAL OF OIL & GAS TERMS, 650 (2015). Landowner and overriding royalty interests affect the net revenue interest of a well and, thus, economic viability of drilling.

customary" or provide an average for all dealings under the Prospect Identification Agreement, the terms and payout history of the Petrohawk deal are some evidence of "the prices past purchasers or licensees of the trade secret may have paid." Furthermore, Helfand testified that some type of overriding royalty would be expected in a prospect identification agreement of this nature, and SEPCO's joint exploration agreements with Endeavor, Harman, and Culver (albeit different in nature) also included compensation or similar sliding-scale overriding-royalty provisions tied to the total royalty burden.[10] Documentary evidence, in the form of Notice of Well Activity Reports, further indicates that at least some of the disputed wells had before-payout net revenue interests greater than 75%, which is some evidence of royalty burdens in a range that would support Helfand's recovery of a prospect overriding royalty interest of some amount under the Petrohawk sliding scale.

The evidence that SEPCO acquired 1,888 leases in connection with wells drilled in the sweet-spot regions is undisputed. Evidence of SEPCO's leasing activities is pertinent to two factors the jury could consider in determining an "estimate" of the trade secret's value. First, it comprises evidence that, applying the Petrohawk compensation structure, Helfand would be due a per-mineral-acre prospecting fee for the acreage supporting the wells. The evidence also gives rise to an inference that SEPCO's use of the secret in connection with aggressive leasing would put Helfand at a competitive disadvantage in the same areas. According to SEPCO's reservoir engineer,

---

[10] For example, SEPCO's August 2007 "James Lime Exploration Agreement" with Harman and Culver provides:

> [Harman and Culver (H/C)] agrees to deliver a 75% Net Revenue Interest in and to the Subject Leases to SEPCO with H/C thereby retaining the difference between 25% and any royalty and/or overriding royalty burdening each oil and gas lease comprising the Subject Leases herein. If there are any leases having a royalty and overriding royalty burden that is greater than twenty-five percent (25%), H/C will retain no ORRI [overriding royalty interest] on those leases.

Doug Van Slambrouck, significant leasing in a target area drives up the cost of leasing and affects the economic viability of drilling operations.

Helfand and Muncey also offered expert testimony from Keith Selinger, a reservoir engineer with forty-five years of experience in the oil-and-gas industry, to substantiate a claim of nearly $46 million in past and future damages. SEPCO's chief complaint here concerns the reliability of Selinger's damages calculations. Selinger testified about past and future production revenue from more than 140 SEPCO wells in the sweet-spot areas. The wells were included in the damage model, not by Selinger, but by Helfand based on evidence of SEPCO's drilling operations and leasing activities overlaid on her proprietary maps. The wells were not limited to James Lime wells because the trade secret was not limited to the James Lime and instead targeted production from multiple depths. Selinger did not claim to have personally identified the wells to include in the damage model.

Selinger's calculation of $46 million in damages was based on two broad categories:

1.     $35.3 million in past and future royalties, working-interest revenue, and acreage bonuses for the damage-model wells; and

2.     $10.65 million in proceeds from SEPCO's sale of a fee interest in undrilled mineral rights in the Haynesville/Bossier formation in East Texas ("deep rights" below the Travis Peak formation).

Selinger's calculation of the first category included several constituent calculations that were derived by applying the Petrohawk compensation scheme to past production revenue and estimates of future production revenue: (1) $409,881 prospect fee/acreage bonus; (2) $15.2 million in royalties on accrued production, calculated using a flat 3% overriding royalty and a 6.25% back-in working interest; (3) $12.5 million projected future royalties based on a flat 3% overriding royalty on projected future production; and (4) $7.3 million future value based on a 6.25% back-in working

20

interest applied to an estimate of future production. Selinger determined the present production value of the wells from the production history of each well as reported to the Texas Railroad Commission and calculated future production using a decline curve for each well. In making the production-revenue calculations, Selinger applied a standard industry method, deducting severance and ad valorem taxes and accounting for monthly operating expenses, which varied depending on depth, formation, and location of the well.

When asked at trial whether the 3% overriding royalty, 6.25% back-in working interest, and $20 per-acre lease bonus, is "a customary and reasonable type of compensation that someone would receive for identifying a prospect," Selinger testified that, based on his forty-five years of experience, it is. On appeal, the parties disagree about whether Selinger was referring to the specific amounts or the categories of compensation. Selinger admitted, however, that he was "not really" familiar with the Petrohawk agreement and had "[not] read it and committed it to memory." SEPCO did not object to Selinger's testimony at trial, but before trial filed a motion to exclude his testimony, citing Selinger's inability to provide a basis for the overriding royalty, back-in working interest, and acreage-bonus inputs used in his damages calculations. The trial court denied the motion.

For the second damages category, Selinger determined the amount of the "override portion" of the mineral interest by multiplying the $355 million deep-rights sales price by 3%. Selinger's only explanation of the basis for this calculation was that he "felt like" it "was a fair market value for the . . . 3 percent [overriding royalty] interest in that . . . sale of minerals," but he had no market data to substantiate 3% of the sales price as the fair market value of a 3% override interest. He also did not know whether, following the sale, Helfand would also be entitled to a 3% overriding royalty on any production.

SEPCO did not call an expert witness on damages, but instead attacked the factual underpinnings of Selinger's methodology and the reliability of his damages calculations. Ultimately, the jury awarded significantly less than the amounts Selinger calculated. Although we cannot divine the jury's thought processes, the only figure in Selinger's calculations that bears any apparent relationship to the jury's award is the flat 3% overriding royalty applied to past production revenue on the disputed wells.

On appeal, SEPCO does not challenge Selinger's calculations of present and future production. Rather SEPCO assails the reliability of the damages calculations on the basis of faulty inputs and analytical gaps. SEPCO further argues Selinger's damages testimony is unreliable based on the methodology applied to calculate the "override interest" in the deep-rights sale.

### 2. Probative Value of Selinger's Testimony

We agree with SEPCO that Selinger provided no basis for valuing any override interest in SEPCO's deep-rights sale and therefore conclude Selinger's estimation of $10.65 million in damages related to that sale constitutes no evidence to support the damages the jury awarded. The remainder of Selinger's damages calculations, to which we now turn, though overstated, nonetheless suffice as evidence of actual damages for trade-secret misappropriation. *Cf. Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) ("Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be. We have applied this same rule for lost profits, medical expenses, and attorney's fees—an unsegregated damages award requires a remand.").

To preserve a challenge to the probative value of an expert's testimony, a party must object before trial or when the evidence is offered. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409 (Tex. 1998). The purpose of the objection requirement is to prevent "trial and appeal by ambush"

22

and to allow the offering party "an opportunity to cure any defect that may exist." *Id*.; *cf. Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 252 (Tex. 2004) (plaintiff had opportunity to cure defects by recalling the expert witness). The trial court's ruling on the admission of expert evidence is reviewed for abuse of discretion. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998).

An expert opinion admitted into evidence without objection "may be considered probative evidence even if the basis for the opinion is unreliable." *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009). Even absent an objection, however, an opinion is conclusory and cannot be considered probative evidence if it lacks a factual basis or is made in reliance on a basis that does not support the opinion. *Id.* As we recently explained:

> Courts must "rigorously examine the validity of the facts and assumptions on which [expert] testimony is based[.]" If an expert's opinion is unreliable because it is "based on assumed facts that vary from the actual facts," the opinion "is not probative evidence." This does not mean that an expert's factual assumptions must be uncontested or established as a matter of law. If the evidence conflicts, it is the province of the jury to determine which evidence to credit. Nor does it mean that parties must prove up every inconsequential assumption on which their expert relies.

*Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 832-33 (Tex. 2014) (alterations in original) (citations omitted). Still, "[a]n expert must 'connect the data relied on and his or her opinion' and 'show how that data is valid support for the opinion reached.'" *Id.* at 835 (quoting *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009)). If there is too great an analytical gap between the data relied on and the expert's opinion, the expert's testimony is unreliable. *Id.* ("We are not required . . . to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect." (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 899, 912 (Tex. 2004)).

23

SEPCO argues that Selinger had no reliable basis for applying the Petrohawk compensation structure to the damage-model wells, and even if he did, neither that agreement nor the evidence in the record substantiates a "reasonable royalty" of 3%. SEPCO complains that Selinger (1) failed to provide any basis for applying the Petrohawk compensation structure outside the tri-county area it covered, (2) considered wells that should not have been included in the damage model, (3) failed to make a deduction to the overriding-royalty-interest calculations based on SEPCO's actual working interest in the disputed wells, and (4) incorrectly applied a flat 3% overriding royalty to production revenues instead of a sliding scale to determine the overriding royalty that would be due based on the actual royalty burden for the damage-model wells.

We first consider whether Selinger reasonably relied on the compensation structure in the Petrohawk agreement as a basis for his damages calculation. SEPCO initially objected to Selinger's damages calculations in a pretrial motion to exclude because Selinger testified at his deposition that he had no idea why Helfand's counsel asked him to apply a 3% overriding royalty, 6.25% back-in working interest, and $20 per acre bonus, or why particular wells had been selected for the damage model. However, at the outset of the deposition and repeatedly throughout, Selinger made clear he was in the process of reviewing recently provided data and information and had not finalized his calculations. Selinger nonetheless testified that a reasonable rate of compensation would depend on the parties' agreement and could be more or less than the assumed rates.

Subject to timely disclosure and supplementation requirements under our rules of civil procedure, experts can continue to refine calculations and perfect expert reports. *See Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993) (expert changed damages calculations on eve of trial but was permitted to testify because the methodology had been fully disclosed,

allowing defendants sufficient opportunity to cross-examine and prepare rebuttal experts). Further, an expert opinion may be based on assumed facts supported by the record regardless of whether the factual assumptions are contested. *Hous. Unlimited*, 443 S.W.3d at 833; *see also Caffe Ribs, Inc. v. State*, ___ S.W.3d ___, No. 14-0193, 2016 WL 1267677, at *5 (Tex. 2016) ("An expert's opinion is only unreliable if it is contrary to actual, undisputed facts."). Given the circumstances attending Selinger's deposition, further objection was required at trial when Selinger expanded on the bases for his testimony.

SEPCO did not object to Selinger's testimony at trial, but his understanding of the basis for using the particular inputs from the Petrohawk agreement was only marginally better at that time; accordingly, Selinger's testimony is no evidence that a 3% overriding royalty interest, 6.25% working interest, and $20 per-acre prospect fee are reasonable and customary for a prospect identification agreement. Even so, the Petrohawk agreement remains evidence of "the prices past purchasers or licensees of the trade secret may have paid," and Helfand testified to a 3% overriding-royalty average in transactions under that agreement. As such, the record supports Selinger's reliance on the Petrohawk compensation structure in calculating damages based on the acreage and production of the disputed wells.

SEPCO also takes issue with Selinger's failure to explain why the Petrohawk compensation structure could reliably be applied to similar fee arrangements outside the three-county area covered by that agreement. SEPCO criticizes Selinger's failure to connect the dots between market rates in Angelina, Nacogdoches, and Shelby counties and neighboring San Augustine and Cherokee counties. According to Helfand and Muncey, Selinger need not have done so because other evidence in the record shows that (1) the Petrohawk agreement was based on the same trade secret information and

(2) the trade-secret information identified sweet spots in the same geologic formations using common geologic criteria that applied without regard to the county in which a sweet spot was physically located; consequently, a "reasonable royalty" for Helfand's trade-secret methodology would not vary among counties even if the prices of mineral rights may vary. Moreover, just as the Petrohawk agreement used a single compensation structure for multiple counties, both SEPCO's area-of-mutual-interest agreement with Endeavor and its "Joint Exploration Agreement" with Harman and Culver covered Angelina, Cherokee, and Nacogdoches counties without distinguishing among those counties.

Selinger was not questioned about whether different market influences existed in San Augustine and Cherokee counties and, accordingly, did not explain how any differences might affect the types of compensation and rates a willing buyer and seller would negotiate for the same methodology. But SEPCO's disputed drilling activities included wells in all five counties; thus, any discrepancy among the counties would go only to the amount of damages, not the existence of damages.

The same is true for the wells included in the damages model. SEPCO contends Selinger's damages calculations are no evidence of any misappropriation damages because Selinger included wells that were drilled before SEPCO even had access to Helfand's proprietary information. Other wells included in the damages model were drilled after SEPCO acquired Helfand's trade secrets but too close in time to be attributable to any misappropriation. Consequently, SEPCO argues Selinger's testimony contradicts facts established in the record.

Selinger's damages calculations were based on more than 140 wells, which is at least a few too many. Muncey conceded two wells should not have been included in Selinger's damages model

26

(Beckham Gas Unit No. 3 and Beckham Gas Unit No. 4).  Helfand also admitted the Reavley #1 was drilled and producing before her presentation.  Selinger nonetheless included those wells in the damages model and did not revise his calculations to account for these concessions.  Likewise, documentary evidence indicates that a handful of Travis Peak wells were spudded or producing within a few months after the February 2005 presentation, and these wells were included in the damages model despite evidence it typically takes one to two years to proceed from evaluation of a prospect to active drilling.  The jury had no method for determining the amount of production revenue specifically attributable to any of those wells.  The closest thing to an adjustment in the production revenue is uncontroverted testimony that SEPCO had, at one point, valued the James Lime wells at $229 million.  Again, the discrepancy between the factual record and the damages calculations reflect an overstatement of the damages, but Selinger's calculations are not entirely lacking probative value.

SEPCO next challenges Selinger's overriding-royalty-interest calculations because he failed to make a deduction accounting for SEPCO's actual share of the working interest in the disputed wells.  SEPCO contends Helfand and Muncey cannot recover 100% of a properly calculated overriding royalty unless SEPCO owns 100% of the working interest, and the evidence establishes SEPCO does not own the full working interest in all the disputed wells.  Selinger explained that the overriding-royalty calculation is unaffected by SEPCO's share of the working interest because an overriding royalty interest is a share of gross production.  *See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 180 n.1 (Tex. 2012) ("An overriding royalty is an interest in the oil and gas produced at the surface, free of the expense of production." (quoting *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 542 (Tex. App.—Austin 1999, pet. denied)); *MacDonald v. Follett*,

180 S.W.2d 334, 336 (Tex. 1944) (an overriding royalty interest is "a given percentage of the gross production carved from the working interest but, by agreement, not chargeable with any of the expenses"); *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 599 n.2 (Tex. App.—Austin 2000, pet. denied) (an overriding royalty interest is a fractional interest in gross oil and gas production under a lease and is paid in addition to the usual lessor's royalty); 8 H. WILLIAMS & C. MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS 731 (2015) ("One of the most important aspects of an 'overriding royalty' . . . is that it is a 'royalty,' viz., in the absence of an express agreement to the contrary it is free of costs of which the lessor's royalty is free and it is subject to the costs to which the lessor's royalty is subject."); *see also* n.9, *supra*.

On appeal, SEPCO cites the "proportionate reduction" provision in the Petrohawk prospect identification agreement as requiring a proportionate reduction in the prospect overriding royalty based on working interest. Helfand and Muncey contend the proportionate reduction clause is irrelevant because it does not purport to require a reduction of the prospect overriding royalty based on working interest. The existence and impact of a proportionate reduction clause was not explored at trial and has received scant attention on appeal. We need not consider the issue because it is immaterial to our ultimate disposition, and accordingly, we express no opinion on the matter.

SEPCO's final point is well taken, however. Selinger applied a flat 3% overriding royalty based on the terms of the Petrohawk agreement and, presumably, Helfand's stated track record under that agreement. But the Petrohawk agreement actually employs a sliding-scale overriding royalty tied to the total royalty burden, and analogous agreements in the record similarly bear payout terms tied to the total royalty burden. Significantly, the sliding scale in the Petrohawk agreement zeroes out at a specified threshold. Undoubtedly, the sliding scale is employed to ensure drilling efforts are

economically feasible—the greater the total royalty burden, the lower the net revenue interest for the working-interest owners. *See generally* n.9, *supra*. Failure to take the sliding-scale overriding royalty into consideration in calculating a reasonable royalty for Helfand's trade secrets is a critical misstep.

In trade-secret cases, a measure of uncertainty is tolerated, and to an extent, unavoidable. However, when there is objective evidence from which more certainty can be gleaned, it is incumbent on the plaintiff to produce that evidence. An estimate or an average based on a small sample may be sufficient in some cases, but not in this case. Because the actual overriding royalty interest on the disputed wells could have been determined under the methodology of the exemplary transaction, applying 3% across the board paints an incomplete and misleading picture about the royalty terms a willing buyer and seller would negotiate.

To illustrate, if Helfand owned a trade secret vital to the making of widgets and XYZ widget company misappropriated the information to make 3,000 widgets, a prior licensing agreement with a third party involving a licensing fee of $2 per widget would be strongly probative of a $2 reasonable royalty. But if Helfand previously negotiated a licensing fee of $1 on the sale of small widgets, $2 for medium widgets, and $3 for large widgets, an average of $2 under that deal would be inadequate to establish the value of a reasonable royalty for 3,000 widgets of varying sizes. What if XYZ only made small widgets? Depending on consideration of the other factors bearing on a reasonably royalty, the $2 average could vastly overstate the royalty a willing buyer and seller would negotiate. Even more so, if the scenario were one in which no royalty would be owed at all unless a threshold number of sales occurred or if the prior agreement provided no royalty for small widgets,

29

the plaintiff would bear the burden of establishing the existence of sales qualifying for a licensing fee.

Under the Petrohawk agreement, evidence of production revenue is no evidence that a transaction qualifying for an overriding royalty even exists. If Helfand had sued Petrohawk to recover an overriding royalty on 140 wells drilled based on her recommendation, she would not automatically be entitled to a 3% overriding royalty even if her average on three other deals (or 3,000 other deals) was 3%. The onus would be on Helfand to prove each prospect she presented to Petrohawk qualified for an overriding-royalty interest under the contract. Evidence of a past average would not be sufficient to prove the existence of any damages and certainly not a flat 3% overriding royalty interest.

The issue here, of course, is the reasonable royalty that would obtain for use of the trade secret, not a reasonable overriding royalty, and we acknowledge the need for a "flexible and imaginative" approach to calculating damages in trade-secret misappropriation cases. Nevertheless, relying on imagination is not justified when objective evidence is available. Thus, even though the compensation structure in the Petrohawk agreement is merely probative of the trade secret's value, and not necessarily dispositive of a reasonable royalty, we cannot excuse the absence of objective evidence that places the compensation structure in context and bears directly on "the amount that a person desiring to use the trade secret would be willing to pay for its use." Though readily ascertainable, the record here does not contain any evidence of the per-prospect or average overriding royalty that would obtain if the Petrohawk compensation structure were applied to the disputed wells. At best, there is only some evidence that some of the wells carry a net revenue interest north

of 75% and, therefore, would bear fruit to *some* overriding royalty interest under the Petrohawk sliding-scale formula.

Regardless of how the record is viewed—with or without Selinger's testimony—legally sufficient evidence exists to support an award of actual damages, but insufficient evidence exists to support the entire amount the jury awarded. Rendition is not proper, however, because an overstatement of damages does not entirely defeat recovery when there is legally sufficient evidence that damages exist. *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010) ("ERI proved lost profit damages; its entitlement to recover them survives the trial court's error in awarding too much."); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 109 (Tex. 2009) (remanding to the court of appeals when there was some evidence of damages, but not enough to support the full amount awarded by the trial court); *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 739 (Tex. 1997) ("When supported by legally sufficient evidence, an unsegregated damages award—whether in the form of attorney's fees or actual damages—ordinarily requires a remand."); *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938) ("[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."). Because legally sufficient evidence supports less than the full amount awarded, we remand for a new trial. *See Minn. Mining*, 953 S.W.2d at 739-40.

## B. Statute of Limitations

We next consider whether Helfand and Muncey's trade-secret misappropriation claim is barred by limitations as a matter of law. "A person must bring suit for misappropriation of trade secrets not later than three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." TEX. CIV. PRAC. REM. CODE § 16.010. "A

misappropriation of trade secrets that continues over time is a single cause of action [and the three-year limitations period] begins running without regard to whether the misappropriation is a single or continuing act." *Id.*

Unless an accrual date is prescribed by statute, "[c]auses of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011). As a general proposition, a cause of action accrues when a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *See Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex. 1994). A cause of action for trade-secret misappropriation accrues "when the trade secret is actually used." *Comp. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). "Use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret." *Global Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 930 (Tex. App.—Dallas 2008, pet. denied) (citing *Metallurgical Indus.*, 790 F.2d at 1205); *accord Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444 450-51 (5th Cir. 2007) ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' . . . [including] relying on the trade secret to assist or accelerate research or development . . . ." (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c)). Because the discovery rule applies to trade-secret misappropriation claims, however, the statute of limitations did not begin to run until Helfand knew or should have known of facts that in the exercise of reasonable diligence would have led to discovery of the misappropriation. *See* TEX. CIV. PRAC. REM. CODE § 16.010; *Baker Hughes, Inc. v. Keco R. & D.,*

*Inc.*, 12 S.W.3d 1, 2 (Tex. 1999) (acknowledging section 16.010 adopted the discovery rule for determining the accrual of a misappropriation-of-trade-secrets claim).

Although "[t]he date a cause of action accrues is normally a question of law," *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011), reasonable diligence is an issue of fact, *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979). Helfand sued SEPCO on February 17, 2009, and the jury found she "discovered or, in the exercise of reasonable diligence, should have discovered [SEPCO's] use or disclosure of the trade secrets" in January 2009. Because limitations is an affirmative defense, SEPCO can overcome the jury's finding only with conclusive evidence that Helfand knew or, with reasonable diligence, could have discovered before February 17, 2006, that SEPCO was using her trade secrets. *See* TEX. R. CIV. P. 94; *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 284 n.7 (Tex. 1998) ("To overcome the trial court's adverse finding on a factual proposition for which it bears the burden of proof, a party is required to establish on appeal that the evidence conclusively establishes the proposition."). In determining whether conclusive evidence exists, we must review all evidence supporting the jury's verdict as true and reject all contrary proof if a reasonable jury could. *City of Keller*, 168 S.W.3d at 822.

Without conceding liability, SEPCO contends the discovery rule's tolling effect ceased in 2005, at the latest, based on (1) emails Helfand wrote or was party to in May 2005 that reveal her concerns and suspicions about SEPCO's retention of Helfand's proprietary information and (2) her testimony at trial that she knew SEPCO was drilling in sweet-spot areas in the summer of 2005. The emails SEPCO relies on pertain to Helfand's request that SEPCO return all data and materials Team Works provided in connection with the February 2005 presentation, which she needed for her

33

dealings with Petrohawk. SEPCO returned some of the materials, but not all. Among the initial return of materials, Helfand found data and information she said Wells had shared with SEPCO, but not her. These circumstances, along with SEPCO's delay in responding with an offer despite implying an interest in the deal, raised Helfand's suspicions about Wells's interactions with SEPCO on Team Works's behalf.

On May 16, 2005, Helfand sent a lengthy email to Brent Taber, a friend who helped broker the Petrohawk deal, recounting the events of the preceding three months. She expressed frustration at SEPCO's delay in making a decision on the Pearson deal and failure to promptly return all the information she had provided, noting:

- SEPCO's Reavley well "has now expanded into Angelina County—one of the sweet spots that [Wells] is aware of and that Pruet knew I had worked."

- She had asked Wells about SEPCO's failure to make an offer, telling him she "felt that there was something wrong."

- She questioned the reason Wells gave for the failure to receive an offer—that SEPCO could not meet the terms—on the basis that she had communicated that the terms were "open."

- Because Pruet had not responded to her email "telling him to make an offer as he promised and that there was no buyer[,] [i]t was becoming obvious . . . that something was not right" and that Wells's "continued conversations with [SEPCO] may have been detrimental to the process."

- SEPCO had not returned all the information she had provided despite emails and telephone requests.

- Wells had provided additional information to SEPCO, which he had not also shared with her, and what SEPCO had returned "clearly indicate[d]" Wells provided one side of the transaction (namely SEPCO) "sufficient color coded, cross referenced material to allow them to completely map the Pettet, Travis Peak and James in the past three months and substantiate the prospects with just Pettet and Travis Peak potential with the upside of the James and Cotton Valley making it a very valuable acreage position."

34

- She closed by saying, "I fear the concepts and methodology that I have spent years developing are now being used by unentitled parties."

The same day, Taber emailed Wells to "encourage" him to oversee the return of all data provided to SEPCO, including all copies, in accordance with the confidentiality and noncompete agreement. At the time, SEPCO had neither expressly accepted nor rejected the Pearson deal, and Taber said Helfand was "quite upset" about the way things had unfolded. In the email, to which Helfand was a party, Taber takes issue with SEPCO's behavior following the February 2005 presentation and the failure to promptly return all data. Taber believed it "apparent" that SEPCO was "stringing [Helfand] along and felt like they had no competition" until Petrohawk entered the picture. He commented, "[S]omething is troubling about their handling of the deal, especially given the substantial data they have." The three-month delay in providing Helfand a response was, according to Taber, "either an embarrassing testament to their competence or, sadly, a disingenuous description of what has been going on." He further noted, "Management seems to be supporting a lot of leasing in the trend, even in other areas brought to your or their attention through [Helfand]." Suggesting Wells was not acting honorably, Taber stated, "In principle, this whole thing, especially the dismissive attitude you have shown to [Helfand] about the data and the ability of someone to knock off her methodology, smells to the heavens." In closing, Taber warned: "I would also think that you would want to steer clear of other identified trend prospect areas that you became aware of through your dealings with [Helfand.]"

In response to Taber's email, Wells expressed indignation and surprise, demanding an apology. Taber complied, but noted that SEPCO's "contradictory behaviour [sic] does not make sense." He further explained that Helfand was shocked upon discovering Wells had provided information to SEPCO which she had never seen but believed to be "very powerful to the value of

35

the deal." He acknowledged, however, that Wells might not have considered the information particularly relevant or compelling. At any rate, he understood Wells as "strongly indicat[ing]" that any concerns were "unwarranted."

The following day, Wells and Helfand engaged in another email exchange. Wells referenced Helfand's suggestion that SEPCO "was trying to steal something from [them] or that [he] somehow conspired with [SEPCO]," stating he neither approved of the suggestion nor believed SEPCO would do so. Helfand apologized and asked Wells to see the "strangeness" of the SEPCO deal, communications, and timing. Helfand and Wells continued to have strained relations in the months that followed, with Wells asserting "there is (or was) no conspiracy of any kind" and he "never tried to undermine the project" and had no motive to do so.

SEPCO's burden on appeal is to establish the date misappropriation was discovered or discoverable as a matter of law, but it has failed to do so. The evidence SEPCO relies on amounts to mere surmise, suspicion, and accusation. Without more, subjective beliefs and opinions are not facts that in the exercise of reasonable diligence would lead to the discovery of a wrongful act. *Cf. Childs v. Haussecker*, 974 S.W.2d 31, 37-39 (Tex. 1998) (a diligent plaintiff's "mere suspicion" or "subjective belief" that a causal connection exists between occupational exposure and symptoms of latent occupational disease "is, standing alone, insufficient to establish accrual as a matter of law"). Moreover, shortly after the May 16 email exchange, SEPCO purported to return all remaining data and information to Helfand, and she was entitled to rely on that representation absent proof she had actually discovered otherwise. *Cf. Stafford v. Wilkinson*, 304 S.W.2d 364, 367 (Tex. 1957). While Helfand was cognizant of the potential and opportunity for SEPCO to misappropriate her trade secrets, the May 2005 emails reflect Helfand's main concern was retrieving her data. Once SEPCO

36

returned the information to Helfand as requested, the record discloses no objective basis for her to inquire further.

SEPCO has not identified any evidence revealing what Helfand would have discovered had she made further inquiry. To the contrary, evidence admitted at trial demonstrates that an inquiry into SEPCO's leasing activities would not necessarily have disclosed anything untoward. In fact, leasing activities may be conducted under farm-out agreements, area-of-mutual-interest agreements, and exploration agreements that are not publically available. Leases may also be acquired in the name of a landman to avoid public disclosure of drilling operations or filed without disclosing the true drilling objective. While drilling information may be public, SEPCO did not drill its first James Lime well until October 2007.

SEPCO's reliance on Helfand's testimony that she knew SEPCO was drilling in the sweet-spot areas in the summer of 2005 is no more conclusive. The record only discloses that Helfand was aware of the Reavley well's expansion into sweet-spot areas. The Reavley well, a Travis Peak well, was known to Helfand before the February 2005 presentation; accordingly, her knowledge of related drilling operations and leasing adds nothing to the analysis.

In asserting the misappropriation claim is time-barred as a matter of law, SEPCO relies on our decisions in *PPG Industries, Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 94 (Tex. 2004), in which we held the limitations period commenced upon notice of sufficient facts that would cause a reasonable person to make further inquiry, and *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 203-07 (Tex. 2011), in which we held claims were time-barred because the plaintiffs had actual knowledge of the injury and cause outside the limitations period. But the facts in *PPG Industries* and *Emerald Oil* are materially distinguishable from the present case.

37

In *PPG Industries*, the claimant waited nine years to sue after 3,000 defective windows in a commercial building were replaced following the claimant's written complaint about "deterioration" of the windows' reflective coating. 146 S.W.3d at 93. The evidence established that 3,000 windows was an "extraordinary number of failures" (roughly 25% of the building's windows) and was therefore sufficient, as a matter of law, to put a claimant on notice that "something [was] amiss." *Id.* at 93-94. But we explained, "This is not to say [the claimant] was required to file suit every time it noticed a scratch. The evidence was undisputed that a few defective window units are inevitable in a construction project of this size; a few isolated defects would not establish discovery as a matter of law." *Id.* at 94. In like measure, mere suspicion or incidental knowledge of some leasing or drilling activities in sweet-spot areas covering thousands of acres would not, in and of itself, conclusively establish Helfand knew or should have known something was amiss.

In *Emerald Oil*, royalty owners sued Exxon for plugging and sabotaging productive wells six years after writing a letter to Exxon, admitting they knew of the well-plugging plan and threatening a lawsuit if the plan was executed. 348 S.W.3d at 201, 204. Five years before filing suit, Exxon informed the royalty owners in writing that it had plugged and abandoned the wells. *Id.* at 203-04. A related claim based on junking the well was also time-barred because Emerald Oil had informed the royalty owners in a publically available report that Exxon had cut casing in seven of the wells and thrown junk in one of them, making reworking the wells more costly. *Id.* at 205-07. While the royalty owners in *Emerald Oil* had actual knowledge of their claims within the limitations period, the evidence of Helfand's knowledge is not even remotely similar in type and degree.

Unlike *PPG Industries* and *Emerald Oil*, the record here does not compel the conclusion that, before February 17, 2006, Helfand knew or, with reasonable diligence, could have discovered SEPCO's misappropriation of her trade-secret information.

## C. Breach-of-Contract Damages

In a cross-petition for review, Helfand and Muncey challenge the court of appeals' take-nothing judgment on their claim for breach of the confidentiality agreement. The parties disagree about whether the court of appeals's judgment is based on insufficient evidence to support the damages awarded or failure to submit a proper measure of damages in the jury charge. Helfand and Muncey contend the latter and assert SEPCO neither made a proper objection to the damages submission in the trial court nor raised the issue on appeal.

The jury found SEPCO breached the confidentiality and noncompete agreement and awarded $11.445 million as "the value of the trade secret to Helfand and Muncey." "Value of the trade secret" was the only measure of contract damages submitted to the jury;[11] it had a single definition in the charge; and it was the same measure of damages used for the trade-secret misappropriation, breach-of-fiduciary-duty, theft, and fraud claims. On appeal, SEPCO challenged the actual damages award of $11.445 million without distinguishing among the theories of liability, arguing globally that Selinger's testimony was unreliable and no evidence of damages.

---

[11] The breach of damages submission, Question No. 12, inquired:

**What sum of money, if any, if paid now in cash, would fairly and reasonably compensate for the damages, if any, that resulted from such failure to comply with the Confidentiality Agreement?**

Consider the following elements of damages, if any, and none other.

A. The value of the trade secret to Helfand and Muncey.

Answer in dollars and cents, if any.

ANSWER: $11,445,000.00

Although the court of appeals affirmed the award of actual damages for trade-secret misappropriation, it sustained SEPCO's evidentiary challenge to the jury's award of actual damages for breach of contract, explaining:

> [T]here is nothing in the record showing that Helfand sustained a specific injury from the breach. She sold the Pearson prospects to Petrohawk for a substantial sum. There is no evidence of opportunities lost or losses sustained attributable to Sepco's breach. The measure of damages Selinger employed (defendant's gain) was proper in calculating Helfand's tort damages for misappropriation of her trade secret. But it is not the appropriate measure of contract damages. "Where a right of action for breach of contract exists, compensatory damages will be given for the net amount of the losses caused or gains prevented in excess of savings made possible . . . ." 5 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 992 (1964) (quoting RESTATEMENT, CONTRACTS § 329). In the absence of evidence that Helfand sustained loss or was denied gain by Sepco's breach, there is no basis for the jury's finding of damages for Sepco's breach of the confidentiality agreement.

411 S.W.3d at 613-14. Fairly characterized, the court of appeals held "value of the trade secret" is not a proper measure of contract damages and the evidence is insufficient to sustain an award of actual damages under the proper measure of such damages.

At the charge conference, SEPCO objected, without elaboration, that the contract-damages submission "doesn't look like a proper measure of damages for breach of contract." On appeal, SEPCO abandoned that argument, however, relying instead on its evidence-sufficiency point. Accordingly, error in the measure of contract damages, if any, was not properly before the court of appeals, and reversal of the trial court's judgment on that basis was improper. *See* TEX. R. APP. P. 33.1; *Wells Fargo Bank, N.A., v. Murphy*, 458 S.W.3d 912, 916 (Tex. 2015); *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 236 (Tex. 2008); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *see also Elliff v. Texon Drilling Co.*, 210 S.W.2d 558, 560 (Tex. 1948) (holding the appellate court "was without authority to pass upon the propriety of the measure of damages" because the issue, preserved in the trial court, was not raised on appeal).

40

On appeal to this Court, SEPCO presents a new legal-insufficiency argument as an alternative basis for affirming the court of appeals' take-nothing breach-of-contract judgment. SEPCO asserts the court's breach-of-contract judgment can be affirmed on the alternative ground that the trial court failed to give two jury instructions SEPCO requested based on the termination date in the confidentiality and noncompete agreement; the evidence must be measured against a charge that includes those instructions; and if so measured, "no evidence [ties] damages to the 1-year time frame" in the agreement.

At trial, SEPCO requested, and the trial court refused, the following two jury instructions:

You are instructed that Helfand consented to any use of the information shared pursuant to the Confidentiality Agreement after February 14, 2006 by agreeing that "the Agreement shall terminate and be of no further force and effect twelve (12) months following the Effective Date."

Consider only those profits that were earned as a result of uses or disclosures occurring between February 15, 2005 and February 14, 2006.

SEPCO labeled the former as a proposed "consent" instruction and the latter as a proposed "damages time-frame" instruction, but at times during the charge conference, generally objected to some submissions as lacking a 12-month-limitation instruction.

The trial court did not abuse its discretion in refusing SEPCO's instructions for several reasons, including that (1) the time-frame question limits the jury's consideration to benefits received by the defendant but the "value of the trade secret" is not similarly defined or limited; (2) the record includes evidence that, within the twelve-month period following execution of the agreement, SEPCO used Helfand's information other than to evaluate the Pearson prospects and retained confidential information after Helfand requested its return; (3) the record includes evidence that benefits to the defendant resulting from "uses or disclosures occurring between February 15, 2005

41

and February 14, 2006" would not necessarily be realized or fully realized within that period; and (4) the confidentiality and noncompete agreement cannot reasonably be construed as granting "consent" to use confidential information after the contract's termination date because it expressly restricts SEPCO's use of the information to evaluating the Pearson prospects and requires SEPCO to "promptly return, or upon request by TEAM WORKS, destroy the original and all copies of the Confidential Information." *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) ("The trial court has considerable discretion to determine proper jury instructions."); *cf. Univ. Computing*, 504 F.2d at 539 (outlining reasonable royalty factors for value of the trade secret to the plaintiff).

Nevertheless, for the reasons previously explained, we reverse the court of appeals' breach-of-contract judgment and remand for a new trial because evidence supports the existence of damages under the "value of the trade secret" submission, but no evidence supports the entire amount the jury awarded. *See Osterberg*, 12 S.W.3d at 55.

### D. Remaining Issues

SEPCO also complains that (1) the trial court abused its discretion in excluding otherwise admissible evidence of Helfand and Muncey's prior allegations against settling parties in this case; (2) the definition of "improper means" in the jury charge was defective because it included component terms that were vague, lacked evidentiary support, or created *Casteel* error; (3) it was entitled to an instruction that damages were limited to the defendant's profits during the term of the confidentiality and noncompete agreement; and (4) it was entitled to an instruction that Helfand consented to SEPCO's use of the trade-secret information following the one-year expiration date in that agreement. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388-89 (Tex. 2000). The parties

42

disagree about the substantive merits of these issues, harm, preservation in the trial court, and waiver in the court of appeals.

We review a trial court's evidentiary and jury-charge rulings for abuse of discretion. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015) ("We review a trial court's exclusion of evidence for an abuse of discretion."); *Kingfisher Marine Serv. L.P. v. Tamez*, 443 S.W.3d 838, 842 (Tex. 2014) ("A trial court's rejection of a proposed definition is reviewed for abuse of discretion."); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) ("We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard."). Erroneous rulings require reversal only if a review of the record reveals the error was harmful. TEX. R. APP. P. 44.1. In some cases, such as preserved *Casteel* error, harm may be presumed. *See Crown Life Ins. Co.*, 22 S.W.3d at 388-89. Complaints about the trial court's refusal to include the consent and time-frame instructions are mooted by our disposition of the trade-secret misappropriation and contract-breach claims. Because the remaining evidentiary and jury-charge issues may not recur during the new trial on remand, we do not address them. *See Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 239 (Tex. 2011).

The final issue concerns the disgorgement award. Although the jury found SEPCO made $381.5 million in profits attributable to trade-secret misappropriation,[12] the jury did not award disgorgement of profits and was not asked to do so; the disgorgement award was court ordered. Even if a jury could award disgorgement of profits as actual damages under either contract or

---

[12] The record does not bear evidence of SEPCO's profits from the disputed wells; the evidence at trial only substantiates $381.5 million in past production revenue. The jury's finding, however, was not challenged on appeal.

trade-secret law,[13] the latter of which SEPCO allows only for the sake of argument, the question is whether equitable disgorgement is ever available absent a fiduciary relationship and, if so, whether it is cumulative of other remedies or available only to the exclusion of other remedies.

The court of appeals summarily vacated the disgorgement award, holding that equitable relief in the form of profit disgorgement is limited to breaches of fiduciary duty and was improper in this case because the confidentiality and noncompete agreement did not create a fiduciary relationship between SEPCO and Helfand. 411 S.W.3d at 614. While equitable disgorgement is a viable remedy for breach of trust by a fiduciary, *ERI Consulting Eng'rs, Inc.*, 318 S.W.3d at 873, we have not expressly limited the remedy to fiduciary relationships nor foreclosed equitable relief for breach of trust in other types of confidential relationships. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 43. We need not address the issue at this time, however, because whether

---

[13] *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §§ 3 (restitution as a remedy for wrongful gain), 39 (disgorgement of profit from opportunistic breach of contract), 42 (disgorgement for profitable interference with intellectual property rights, such as trade secrets), 43 (disgorgement of benefit obtained in breach of a fiduciary duty or "equivalent duty imposed by a relation of trust and confidence"); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 ("One who is liable to another for an appropriation of the other's trade secret under the rule stated in § 40 is liable for the pecuniary loss to the other caused by the appropriation or for the actor's own pecuniary gain resulting from the appropriation, whichever is greater, unless such relief is inappropriate under the rule stated in Subsection (2)"); *see also* TEX. CIV. PRAC. & REM. CODE § 134A.004 (damages for trade-secret misappropriation "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by other means, the damages . . . may be measured by imposition of liability for a reasonable royalty . . . .") (effective September 1, 2013). *But see Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952) ("The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. . . . [A] party generally should be awarded neither less nor more than his actual damages."); *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("Disgorgement of profits is not a measure of damages available in a breach of contract action."); *Bancservices Grp., Inc. v. Strunk & Assocs., L.P.*, No. 14-03-00797-CV, 2005 WL 2674985, at *6 (Tex. App.—Houston [14th Dist] Oct. 20, 2005, pets. denied) (mem. op.) ("For a breach of contract action, the measure of damages is not the benefits received by the defendant, but the loss or damage actually sustained by the plaintiff."); *but see also Hoffman v. L & M Arts*, No. 3:10-CV-09-53-D, 2014 WL 4375667, at *17 (N.D. Tex. 2014) (making an *Erie* prediction that Texas would not adopt section 39 of the Restatement (Third) of Restitution and Unjust Enrichment, which authorizes disgorgement of profits from opportunistic breach of an enforceable contract, because it "would permit a plaintiff to recover more for breach of contract than is necessary to compensate her for the loss sustained as a result of the breach").

disgorgement remains equitable must be determined anew on remand and in light of the liability and value determinations following a new trial.

### III. Conclusion

For the reasons stated, we reverse and remand to the trial court for a new trial not inconsistent with this opinion.

_____
Eva M. Guzman
Justice

**Opinion delivered:** June 10, 2016