In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00020-CV

**WATERSTONE ON LAKE CONROE, INC.
AND STEVE BOWEN, Appellants**

**V.**

**KEITH DEWBERRY AND JOHN T. FONT, Appellees**

**On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 18-03-03990-CV**

## MEMORANDUM OPINION

The underlying litigation arises from a dispute over canals in the Waterstone on Lake Conroe ("WOLC") development, which had been marketed as a waterfront community. WOLC property owners, Keith Dewberry and John T. Font (collectively, "Appellees"), sued Steve Bowen and three entities he owned, WOLC, Inc., My Green Homes, LLC, and Virgin Homes, Inc. (collectively, "Appellants")

1

for statutory and common law fraud.[1] Dewberry and Font alleged that when WOLC canals providing access to Lake Conroe became silted in after rain events in 2016, Appellants failed to maintain the canals and return them to a navigable state. A jury returned a verdict for Dewberry and Font. In five issues, Appellants challenge the trial court's judgment for Dewberry and Font. For the reasons discussed below, we affirm the trial court's judgment.

## BACKGROUND AND TRIAL EVIDENCE

### The Canals

The evidence at trial demonstrated that the WOLC development was marketed as having six-foot center depth canal-front lots that provided boat access to Lake Conroe. In 2008, WOLC was in "predevelopment," and the digging of the canals commenced, but the canals were not finished until 2010. Sometime around 2010, the WOLC canals filled with water, but the lake level dropped up to nine feet during a 2011 drought, which impacted the canals. When the rains resumed, the canals

---

[1]While other Plaintiffs sued, they are not parties to this appeal, as some arbitrated their claims and others nonsuited their claims. The Plaintiffs also sued unrelated Defendants, including Phillip LeFevre, LeFevre Development, Inc., and LeFevre Investments, Inc. The trial court granted the LeFevre Defendants' Motion for Summary Judgment as to Dewberry's and Font's claims prior to trial, and they are not parties to this appeal. *See Kozak v. LeFevre Dev., Inc.*, No. 09-18-00369-CV, 2019 WL 2220305, at *1 (Tex. App.—Beaumont May 23, 2019, no pet.) (mem. op.) (explaining that trial court granted summary judgment for LeFevre Defendants and severed those claims). The Final Judgment incorporated the arbitration award for the other Plaintiffs.

refilled. The evidence established that through 2015 (except for the 2011 drought), the canals could be used by boats to access Lake Conroe, although the canals had some shallow spots. Bowen testified there was a rain event in 2015 that required work around the development's peninsula, but the canals remained usable by boats.

In 2016, there were two significant rain events in close temporal proximity to each other, one on Tax Day and the other on Memorial Day. The evidence established that after the Memorial Day flood, the WOLC canals became unusable by boats and no longer provided access to Lake Conroe and remained so through trial in February 2020. Video and photographic evidence admitted at trial showed the canals full of silt.

**Steve Bowen's Testimony**

Bowen is the sole owner, president, and only officer of WOLC, Inc. Bowen testified that he previously developed several other canal-front communities. Bowen testified he told residents when they bought their properties that WOLC would maintain the canals until a certain number of lots were sold, at which time the maintenance of the canals would be turned over to the Property Owners' Association ("POA") and that was always his intent. Bowen also represented to buyers that the canals were supposed to be six feet deep in the center.

Bowen testified, "We didn't promise that we would maintain them forever. We said we would maintain the canals. We would dig them. We would create water

3

there. But the . . . events that happened is far beyond what we would normally do." According to Bowen, WOLC purchased a barge for $100,000 in 2014 to maintain the canals. He bought the barge for general canal maintenance and cleanup, but it was never intended to re-dredge or dig the canals. Bowen testified that he never had a maintenance program for the canals, nor did he require anyone to regularly check their condition or depth.

Bowen offered multiple explanations for why he had not cleaned the canals and restored their navigability. First, he said that until another developer cleaned up upstream and the City of Montgomery ("the City") repaired the Buffalo Springs Bridge upstream, the silt would just wash back down into the canals. The other developer, LeFevre, began cleaning in 2018, and the City did not complete the bridge repairs until 2018. Bowen then testified the Plaintiffs interfered with cleanup by filing complaints with the Army Corps of Engineers and the Texas Commission on Environmental Quality. Bowen testified that when they complained, he ceased all work out of respect for the agencies and because the agencies scared him. He also testified the lawsuit impeded repairing the canals. Bowen would not provide information about his plans to remediate the canals but testified the damage was temporary. He claimed he does not intend to leave them in their current condition, he wants to fix them, and the plan is to provide "navigable" access to Lake Conroe. Bowen also testified that the Plaintiffs could fix the canals themselves, but he

4

acknowledged it would be expensive and might cost as much as Dewberry's and Font's properties. However, it should be noted that Bowen owned the canals, not the adjacent property owners.

**Jack Yates's Testimony**

Jack Yates was the City Administrator for the City from 2014 until 2019, which included the period after the Tax Day flood and the Memorial Day flood. He testified that after the storms, Bowen tried to get the City to repair the WOLC canals. When Bowen asked if the City had a position about repairing the WOLC canals, Yates told Bowen that the city council had discussed it. Yates explained that Bowen owned the canals, so the City's position was that it was not responsible for repairing them. Yates added that the City never told Bowen he must wait to remediate the canals until it completed the repairs on Buffalo Springs Bridge. He also testified that Bowen acknowledged he was responsible for the WOLC canals.

**Keith Dewberry's Testimony**

In July 2008, Dewberry bought a lot in WOLC during the "predevelopment" phase for $123,900. When he purchased his lot, the canal was dug at the back of his property but there was no water yet. Before purchasing it, Dewberry met with Bowen, with whom he had a previous acquaintance, and asked about the canals. Dewberry grew up with Bowen's employee, Brock Jeffus, and Dewberry's family lived in another of Bowen's developments.

During those pre-purchase discussions, Dewberry asked Bowen that since the subdivision was marketed as a waterfront community, whether they would have lake access, so he could get to his grandparents' and parents' home which were in a different canal subdivision on Lake Conroe. Bowen confirmed that WOLC would have Lake Conroe boat access and he told Dewberry that WOLC would maintain the canals until enough lots were sold in the subdivision at which time the maintenance of the canals would be turned over to the newly created WOLC POA. The only time he spoke with Bowen was in 2008 before he bought the lot. At the time of trial, Bowen had not sold enough lots in the subdivision to allow him to turn over the maintenance responsibility of the canals to the WOLC POA.

**John Font's Testimony**

In 2014, John Font and his wife purchased their home in WOLC as a resale. John testified that among other things, they wanted a waterfront house, so he would have Lake Conroe access for his jet skis and boat and a place for his grandkids to fish. He heard about the home from his friend and had seen advertisements for WOLC. Font testified that before purchasing their home, he and his wife took their jet skis up the canal from Lake Conroe. They were concerned that the canals were shallow in spots with sandbars, and they had to "navigate through it."

Font testified prior to purchasing his home, he investigated the canals' maintenance and navigability by going to WOLC and meeting with Sonya Renteria,

6

who was Bowen's employee and the sellers' agent. Renteria then introduced Font to Bowen. He expressed his concerns about the sandbars and low spots to Bowen. Bowen told Font that he "purchased a dredger and that he was going to maintain and dig it to where it would be approximately 6-foot deep in the center." Font testified that if the canals did not give him Lake Conroe access, then he did not need the house and would not have purchased the property. Font described Bowen as "a very good salesman" and said Bowen's representations about maintaining the canals impacted Font's decision to buy the home. Font testified that Bowen "guaranteed me it would be navigable to Lake Conroe."

**Sonya Renteria's Testimony**

Sonya Renteria, a sales manager who worked for Bowen at WOLC and in his prior developments, testified. She explained that Bowen learned in his earlier canal development at Grand Harbor, that digging and maintaining the canals was "way more expensive than I think he thought it might be." Renteria was the sellers' agent for the home the Fonts purchased and worked through Bowen's real estate brokerage company, Lake Conroe Waterfront Realty. She testified she earned a commission when she sold the home to the Fonts, and Bowen and his brokerage company obtained a benefit.

In terms of what they told prospective buyers about the depths of the canals, Renteria explained that "we always told them whether it – when it filled up or not,

7

it was 250 above the bulkhead, 2 feet out, 4 foot, 6 foot, and then 8 foot in the center. That is how we always cut all of our canals." Renteria came to believe she was being asked to tell residents things that were untrue. She said, "We kept telling them that we were going to take care of things, and we didn't. Even when . . . we got it to where it was going to be affordable for us to do so, it still didn't happen."

Although she initially believed Bowen's representations about the canals, she later determined they were lying to the residents. Renteria said that sandbars in the canals had grass growing on them, which made potential buyers question the depth. Bowen instructed Renteria to tell customers who asked that "[w]e would take care of any issues. We, meaning, Steve, me, the development." She testified that Bowen had workers go out in a canoe and remove visible grass. Renteria explained they did so because, "People were questioning us about it. We're telling them it's navigable all the way down." Renteria eventually disbelieved that Bowen had ever intended to fulfill his promises and learned he was trying to sell their three developments. She also testified that Bowen purchased the dredger to sell back to the POA just for show. Renteria agreed that Bowen told prospective purchasers whatever they needed to hear to make the sale. At times, she heard Bowen try to say that other entities, like the San Jacinto River Authority or the City owned the canals, but she learned that was untrue.

**Matthew Reibenstein's Testimony**

Matthew Reibenstein, another former WOLC employee who worked for Bowen between 2010 and 2011, testified. He said they had problems with sandbars or the canals being shallow, and the canals were not navigable to Lake Conroe. Reibenstein overheard conversations between Bowen and Bill Martinez, a dirt contractor. Reibenstein testified he heard Bowen tell Martinez to use his excavator and long arm bucket to push dirt mounds that built up in WOLC's canals under the water level "so it couldn't be seen[,]" and "it didn't look like it was so shallow," during "a big sales weekend." Reibenstein said that doing so did not improve the canals but made the lots look more attractive to buyers.

Reibenstein also discussed his purchase of WOLC lots from Bowen in 2009 with his friend, Brock Jeffus–another WOLC employee. He explained, "It was presented to me as a waterfront community on Lake Conroe. And that at the time that it was undeveloped or partially developed and he would finish bulkheads. That I would have navigable waterway to Lake Conroe. And it was expressed the whole time that that is what I was buying was waterfront lots." Reibenstein testified that he became dissatisfied with Bowen's promises regarding the purchase of his two lots. Reibenstein told Bowen that he felt Bowen's promises about the canals were untrue. He complained about the depth of the canals and that you could not get a boat through. Bowen assured him the issues would be resolved, but they never were.

Ultimately, the matter was resolved when Bowen refunded Reibenstein's money for the lots. Reibenstein testified that in his last conversation with Bowen about the lots, Bowen told him he was going through a lot of financial things and that "I'm sorry I screwed you."

**Brock Jeffus's Testimony**

Brock Jeffus testified that in 2008, he began working for Bowen as a WOLC salesperson. Jeffus explained that in 2008, some canals were dug, and that "[t]he canal system was a part of a total of four neighborhoods including Waterstone. It would be Grand Harbor, Harborside, Grand View and then Waterstone. Waterstone was the last on that canal system." Dewberry was Jeffus's best friend, and in 2008, Jeffus sold Dewberry his lot. The selling points of WOLC that Jeffus provided to Dewberry were canals six to eight feet deep, City water and sewer, no aerobic septic systems, and concrete streets. Jeffus testified that Bowen closed every sale and disputed testimony to the contrary. Jeffus said he was present when Dewberry questioned Bowen about the canals.

He testified that when people went up the canals, they had questions about getting to WOLC from Lake Conroe. Jeffus testified Bowen was responsible for ensuring the canals remained navigable to Lake Conroe until he turned everything over to the POA. Jeffus explained that prospective purchasers questioned Bowen about whose responsibility it was to maintain navigability to Lake Conroe, and

Bowen responded that "everything would be dug 6 to 8 feet deep." Bowen also told purchasers that once he turned the POA over, it would be the POA's responsibility. Jeffus testified that his documents said it would be turned over to the POA when all the lots in the first section were sold or 2018, whichever came first, but he did not know if the deed restrictions had ever been amended. Jeffus had a dispute with Bowen over the canals, which they ultimately resolved in 2013, when Bowen returned his money for the lots.

Jeffus testified that he believed Bowen when he purchased his lots, but that changed when Bowen's "actions didn't live up to the things that he said." Jeffus explained that Bowen's broken promises involved the lack of water in the canals, and he kept promising within sixty to ninety days he would have it bulkheaded and dredged and they would have waterfront lots, but three years later, Jeffus realized it was never going to happen.

**Thomas Kozak's Testimony**

Dr. Thomas Kozak, another WOLC resident who sued but arbitrated his claims, also testified. The canals were navigable when they bought their property, and they were told the canals were eight feet deep in the center. When asked about maintenance concerns and canal navigability, Kozak responded, "We made the assumption that lots would continue to be navigable like they were around the rest of the lake. And we visited those properties, too. We saw later on that there was a

dredger there that was purchased for this property, and we just assumed they would be maintained as navigable."

The Kozaks purchased their lot before the Memorial Day flood but had not yet built their house. Kozak testified that after the Memorial Day flood, their neighbors' canal was occluded, but their canal remained navigable "for a little while." Before spending $425,000 to build his house, Kozak wanted to know the canals would remain navigable. After the Memorial Day flood, Kozak asked Bowen several times about the canals, and Bowen always responded they would take care of it in two weeks. Kozak testified they would not have built their house if Bowen had not assured them of canal access. In the Spring of 2017, his canal became unnavigable. Although Bowen purchased a dredger, it never seemed to work, and Bowen never fixed it.

Kozak testified that after Bowen represented to the owners that other entities like FEMA, the Army Corps of Engineers, and the City would fix the canals, Bowen finally agreed to fix them in the Spring of 2017. When Kozak asked these other entities if they would fix the canals, they said they would not. Kozak testified they are approaching five summers with the canal being occluded. Kozak testified he saw work performed after the May 2016 storm but "nothing to remediate the problem" and explained the work was only for property Bowen owned and not the residents.

**Additional Evidence**

Dewberry and Font also offered testimony regarding their damages, including their opinions regarding the current market value of their properties. Daniel Lauw, who rented Dewberry's home between 2016 and 2018, also testified regarding the condition of the canals and his reasons for not going through with a contract to purchase the property. Real estate broker Melissa Seureau testified regarding comparable properties in WOLC and her attempts to sell the Fonts' vacant lot. We detail this testimony in our discussion of damages below. Additional evidence included, among other things: drone footage of the silted WOLC canals; photographs of the WOLC canals before and after they became unnavigable; advertising materials; Dewberry's contract; documents showing rain events and disaster declarations; a Lake Conroe Waterfront Realty printout showing Renteria's earned commissions including for the Fonts' property; Font's Facebook posting complaining the WOLC property was not waterfront; 2015 invoices and payments to contractor for dredging in an unspecified canal and bulkheading invoices and payments; and amended WOLC plat.

**Causes of Action, Defenses, and Remaining Parties**

Dewberry sued for common law and statutory fraud. The Fonts sued for common law fraud. Appellees pleaded the discovery rule applied and that Appellants fraudulently concealed their deceitful conduct. Appellants raised the affirmative

13

defense of statute of limitations as to Dewberry's claims. They also asserted the affirmative defense of "act of God." When the matter was given to the jury, only Keith Dewberry's and John Font's claims against WOLC, Inc. and Bowen remained.

## Appellants' Motion for Directed Verdict

Bowen and WOLC, Inc. moved for directed verdict on multiple grounds. The trial court granted in part and denied in part the motions. The trial court granted the directed verdict as to the claims against My Green Homes and Virgin Homes. The trial court also granted Appellants' Motion for Directed Verdict as to Amy Font's claims.

The trial court denied all other motions for directed verdict, including but not limited to the Defendants motion for directed verdict on Dewberry's claims, asserting that they were barred by the statute of limitations, the Defendants motion for directed verdict arguing the injuries were temporary rather than permanent, and no evidence supported the consideration of permanent injuries, and diminution in market value was not the appropriate measure of damages.

## Jury Charge

During trial, both sides objected to the submission of jury questions on whether Dewberry's and Font's injuries were temporary or permanent and asserted it was a matter of law for the court to decide rather than a question for the jury. The Defendants argued that the injury was temporary, whereas the Plaintiffs asserted the

14

injury was permanent. The trial court overruled these objections to the charge and submitted Questions 12 and 13, which read as follows:

**QUESTION 12**

Is the injury to Keith Dewberry's property and John Font's properties, if any, capable of being repaired, fixed, or restored?

Answer "Yes" or "No."

Answer: <u>NO</u>

If you answered the above question "Yes," then answer the following question.
Otherwise, do not answer the following question.

**QUESTION 13**

Is the injury to Keith Dewberry's property and John Font's properties---
1. of such a character as to recur repeatedly, continually, and regularly, such that future injury can be reasonably evaluated?

or---

2. of such a character that any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty?

Answer "1" or "2."

Answer: _____

Appellants complained that given the temporary nature of the injury, the jury should not be allowed to consider diminution in fair market value as damages. They contended that the appropriate measure of damages was loss of use, and asserted the

Appellees failed to present any evidence of those damages. The Appellants also objected to questions that addressed Dewberry's and Font's damages and contended no evidence supported any element of damages submitted, which the trial court overruled. The questions in the court's charge addressing the different elements of damages for Dewberry and Font included loss of use and enjoyment, diminution in market value, and out-of-pocket expenses.

**Verdict**

The jury found that Bowen and WOLC, Inc. committed common law fraud as to both Plaintiffs and statutory fraud as to Dewberry. The jury also found that Dewberry should have discovered the fraud with the exercise of reasonable diligence by November 7, 2016. Although the jury found both Defendants committed fraud, the jury apportioned 100% of the responsibility to Bowen. The jury awarded diminution of market value damages for Dewberry of $142,000 and $60,000 for Font. The jury also awarded Font $30,000 for loss of use and enjoyment and $10,000 for out-of-pocket expenses Font incurred. The Final Judgment awarded damages for diminution in market value but did not include damages for loss of use or out-of-pocket expenses.

**Post-Verdict**

Bowen and WOLC, Inc. did not complain that the jury's verdict included irreconcilable or fatal conflicts before the trial court released the jury. After the trial

16

court discharged the jury, Bowen and WOLC filed a Motion for Judgment Notwithstanding the Verdict and a Motion for New Trial complaining that the evidence was legally and factually insufficient. In these post-verdict motions, Appellants also argued that some of the questions submitted to the jury were immaterial, and that there were irreconcilable conflicts in the jury's verdict.

## ANALYSIS

### Issues One and Two: Statute of Limitations

In issue one, Appellants contend that the statute of limitations on Dewberry's claims expired in 2012 since he purchased his property in 2008. Thus, the trial court erred by submitting jury question regarding whether Bowen and WOLC, Inc. committed fraud. In support of this, Appellants argue the cause of action accrued when Bowen made the misrepresentation—in 2008, when Dewberry purchased his property. In issue two, Appellants argue the discovery rule does not apply to Dewberry's claims, since his lot did not have lake access between 2008 and 2010 and in 2011.

When a cause of action accrues is normally a question of law. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003); *see also Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) (citations omitted) (discussing accrual in the context of trade secret misappropriation); *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 202 (Tex. 2011). Yet "reasonable

diligence is an issue of fact.[]" *Berry-Helfand*, 699 S.W.3d at 722 (citing *Est. of Stonecipher v. Est. of Butts*, 591 S.W.2d 806, 809 (Tex. 1979)). The statute of limitations for common law and statutory fraud is four years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(4); *Emerald Oil*, 348 S.W.3d at 202. "Causes of action accrue and statutes of limitations begin to run when facts come into existence that authorize a claimant to seek a judicial remedy." *Emerald Oil*, 348 S.W.3d at 202 (citing *Knott*, 128 S.W.3d at 221) (other citations omitted). Said another way, "a cause of action accrues when a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not occurred." *Berry-Helfand*, 491 S.W.3d at 721 (citing *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex. 1994)); *see also Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988) ("In an action for fraud, limitations begins to run when the fraud is perpetrated, or if the fraud is concealed, from the time it is discovered or could have been discovered by the exercise of reasonable diligence."). The Texas Supreme Court has "long held that 'fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered.'" *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (1943)). Causes of action generally accrue and statutes of limitation begin to run when facts come into existence authorizing a claimant to seek a judicial remedy. *Id.*

(quoting *Emerald Oil*, 348 S.W.3d at 202). However, one cannot be allowed to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run. *Id.* (quoting *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996)).

Dewberry pleaded that Bowen concealed his failure to maintain navigable canals and for application of the discovery rule. On March 28, 2018, Dewberry filed suit, and the jury found that he, with the exercise of reasonable diligence, should have discovered the fraud in November 2016. Since limitations is an affirmative defense, Bowen and WOLC can overcome the jury's finding only with conclusive evidence that Dewberry knew or, with reasonable diligence, could have discovered the fraud before March 28, 2014. *See Berry-Helfand*, 491 S.W.3d at 722 (discussing overcoming jury's date of discovery finding pertaining to a statute of limitations defense in context of misappropriation of trade secrets); *see also* Tex. R. Civ. P. 94; *Assoc. Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 284 n.7 (Tex. 1998) ("To overcome the trial court's adverse finding on a factual proposition for which it bears the burden of proof, a party is required to establish on appeal that the evidence conclusively establishes the proposition."). In determining whether conclusive evidence exists, we review all evidence supporting the jury's verdict as true and reject all contrary proof if a reasonable jury could. *See Berry-Helfand*, 491 S.W.3d at 722; *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex. 2005).

19

The record establishes that Dewberry purchased his lot in 2008 during the predevelopment phase, and the canals were not filled with water yet. Before buying the lot, Dewberry asked Bowen about the canals, whether they would have lake access and whether WOLC would be a waterfront community, and whether he could reach his parents' and grandparents' homes in a neighboring canal-front community. Bowen represented that WOLC would maintain the canals until turned over to the POA, at which point the POA would maintain them. At the time of trial, the canals had not yet been turned over to the POA, which meant that Bowen and WOLC were still responsible for canal maintenance.

When Dewberry entered into the lease-purchase agreement with Lauw in March 2016, the canals were navigable. When the Memorial Day 2016 flood occurred, the evidence showed that the canal became silted in, was occluded, and unnavigable. Before that, the evidence showed that the canals were navigable, and Dewberry had no reason to believe that Bowen was failing to maintain the canals as he promised. The City Administrator testified that in November 2016, the City sent a letter advising that it was not responsible for cleaning the WOLC canals and that Bowen had acknowledged his responsibility for the canals.

We disagree with Appellants' contention that the cause of action accrued in 2008 or 2011. A cause of action accrues when a wrongful act causes a legal injury. *See Berry-Helfand*, 491 S.W.3d at 721. In 2008, WOLC was in predevelopment, and

the canals were not finished until 2010, so Dewberry had no knowledge that Bowen and WOLC would not maintain them. Regarding 2011, the record demonstrates there was a severe drought, and Lake Conroe dropped significantly. In fact, during the drought Lake Conroe dropped nine feet. The canals refilled once the rain resumed, and their unnavigable state had nothing to do with Bowen or WOLC's failure to maintain them.

Rather, it was Bowen's and WOLC's failure to maintain them in a navigable state as promised that constituted the wrongful conduct. The evidence demonstrated this became discoverable after the canals became occluded in the Memorial Day 2016 flood. The City Administrator's testimony supports this timeframe. The misrepresentation became evident when Bowen and WOLC refused to return them to a navigable state, and he had taken steps prior to this to conceal his failure to maintain them.

On March 26, 2018, Plaintiffs filed suit. Dewberry's awareness that Bowen's wrongful conduct caused a legal injury occurred after the Memorial Day flood. Therefore, Appellants have failed to provide evidence conclusively establishing that Dewberry could have discovered the fraud with reasonable diligence before March 28, 2014. *See id.* at 722; *see also* Tex. R. Civ. P. 94; *CAT Contracting, Inc.*, 964 S.W.2d at 284 n.7. Dewberry's fraud claims are not barred because the evidence

21

shows he filed them within four years of discovery. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(4). We overrule issues one and two.

## Issue Three: Temporary or Permanent Injury

In their third issue, Appellants argue that whether an injury is temporary or permanent is a question of law. Thus, they contend the trial court erred by submitting Questions 12 and 13 in the charge, which they assert asked the jury to decide whether the injury was temporary or permanent. The judgment awarded Dewberry damages of $142,000 and Font damages of $60,000 for diminution in market value. The judgment did not include the additional loss of use and out-of-pocket damages the jury found for Font.

"[W]hether an injury is temporary or permanent is a question of law for the court to decide." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014). As the Supreme Court of Texas has explained,

> An injury to real property is considered permanent if (a) it cannot be repaired, fixed, or restored, *or* (b) even though the injury can be repaired, fixed, or restored, it is substantially certain that the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonably evaluated. Conversely, an injury to real property is considered temporary if (a) it can be repaired, fixed, or restored, *and* (b) any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty.

*Id.* at 480. A "consequence 'need not be eternal' or 'perpetual' to qualify as permanent." *Id.* (quoting *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264,

277 (Tex. 2004)). A consequence may be permanent "if it is ongoing, continually happening, or occurring repeatedly and predictably." *Id.* (citations omitted). Temporary actions are those whose consequences "do not last for long periods of time, are not ongoing, are not likely to occur again, occur only sporadically, or occur unpredictably." *Id.* (citations omitted). When the facts are disputed and must be resolved to correctly evaluate the nature of the injury, upon proper request, the court must present the issue to the jury relying on these definitions. *Id.* at 481.

The parties disputed whether the canals were reparable. Bowen and WOLC, Inc. argued that Dewberry and Font could repair the canals themselves "if they wanted to." Dewberry and Font contended that they did not own the canals, could not repair them, and Bowen and WOLC, Inc., as owners, were the only ones who could repair the canals. Bowen was the legal owner of the canals, and he had the responsibility and duty to maintain the canals where they were navigable and allowed boat access to Lake Conroe. However, since Dewberry and Font were not the legal owners of the canals, they did not have the legal responsibility, duty, or ability to maintain the canals where they were navigable and allowed boat access to Lake Conroe. The evidence demonstrated that the canals had been occluded and unnavigable for years following the Memorial Day 2016 flood, and Bowen testified at trial "he didn't have plans he wanted to share" to return them to their navigable state. Contrary to Appellants' argument, the trial court did not ask the jury whether

23

the injury was temporary or permanent. Rather, the trial court submitted questions to the jury to resolve the underlying disputed facts using the definitions provided in *Gilbert Wheeler, Inc.* and asked whether the canals were "capable of being repaired, fixed, or restored." *See id.* at 480–81. This question substantially tracked the language in the *Texas Pattern Jury Charges* for damage to property. *See, e.g.*, State Bar of Tex., Texas Pattern Jury Charges —General Negligence, Intentional Personal Torts, & Workers' Compensation PJC 11.5, 12.4 (2022). The jury resolved this disputed fact issue by answering that the canals could not be repaired, fixed, or restored, which was true as to Dewberry and Font. *See Gilbert Wheeler*, 449 S.W.3d at 480–81.

In support of this issue, Appellants also assert that temporary and permanent injuries are "mutually exclusive," and a party may not obtain damages for both in the same action, which is generally true. *See Hous. Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 825–26 (Tex. 2014) (quoting *Schneider Nat'l Carriers, Inc.*, 147 S.W.3d at 276); *Kraft v. Langford*, 565 S.W.2d 223, 227 (Tex. 1978). Here, however, Appellants did not obtain damages for both. Although the jury found that Font sustained out-of-pocket and loss of use and enjoyment damages, the trial court did not include these damages in the Final Judgment. Consistent with the jury's factual finding that the injury was incapable of repair and the trial court's

24

conclusion that it was permanent, the Final Judgment only included Font's diminution in market value damages.

The trial court did not submit a question to the jury asking if the injury was temporary or permanent. Instead, it permissibly had the jury resolve the underlying factual dispute over whether the canals could be repaired. *See Gilbert Wheeler*, 449 S.W.3d at 480–81. The trial court then determined, as a matter of law, the injury was permanent as shown in the Final Judgment when it only awarded damages for diminution in property value. We overrule issue three.

## Issue Four: Irreconcilable Conflicts in the Jury's Verdict

In their fourth issue, Appellants complain that irreconcilable conflicts exist in the jury's verdict. Specifically, Appellants contend that two fatal conflicts exist because: (1) they jury awarded damages because the canals were unnavigable, yet they determined the canals could not be repaired – in essence arguing the jury punished Appellants for failing to repair the canals while determining the canals were not capable of being repaired; and (2) the jury found both WOLC and Bowen committed common law and statutory fraud but WOLC liable for 0% of the damages, a requisite element of fraud.

A fatal conflict in jury answers exists when one answer requires a judgment in one party's favor while another answer requires a judgment in the opposing party's favor. *Los Compadres Pescadores, L.L.C. v. Valdez*, 622 S.W.3d 771, 787

(Tex. 2021) (citation omitted). "[T]o preserve error based on fatally conflicting jury answers, parties must raise that objection before the trial court discharges the jury." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 518 (Tex. 2018); *see also Valdez*, 622 S.W.3d at 787; *Gulf Coast Fiber Servs., LLC v. BMF Drilling, LLC*, No. 09-20-00037-CV, 2022 WL 2975689, at *4 (Tex. App.—Beaumont July 28, 2022, no pet.) (mem. op.) (noting same). When a jury's answers to questions conflict, "the court shall in writing instruct the jury in open court of the nature of the . . . conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations." Tex. R. Civ. P. 295. Since Appellants did not object to the allegedly conflicting answers before the trial court discharged the jury, they cannot now complain the conflicting answers undermine the judgment based on the jury's verdict. *See Valdez*, 622 S.W.3d at 787–88; *Menchaca*, 545 S.W.3d at 518. We overrule issue four.

## Issue Five: Legal and Factual Sufficiency

In their fifth issue, Appellants argue the evidence is legally and factually insufficient to support the jury's verdict. Specifically, they contend there was insufficient evidence to support the elements of a common law fraud claim and Dewberry's claim for statutory fraud. They also assert the evidence is insufficient to support the awarded damages.

**Standard of Review**

In a legal sufficiency review, we must consider all the evidence "'in the light most favorable to the party in whose favor the verdict has been rendered,'" and "'every reasonable inference deducible from the evidence is to be indulged in that party's favor[.]'" *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence is legally insufficient to support a jury finding when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016) (citation omitted). As the sole judges of the witnesses' credibility and the weight to give their testimony, the jurors may choose to believe one witness and disbelieve another. *City of Keller*, 168 S.W.3d at 819. We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* "We will uphold the jury's finding if more than a scintilla of competent evidence supports it." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *Herrera*

27

*v. Wendell Legacy Homes, LLC*, 631 S.W.3d 441, 451 (Tex. App.—Beaumont 2021, no pet.). We presume jurors made all inferences for the verdict, but only if reasonable minds could do so. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). "Jurors may not simply speculate that a particular inference arises from the evidence." *Id.* (citing *City of Keller*, 168 S.W.3d at 821).

When challenging the factual sufficiency of the evidence supporting an adverse finding on which the appellant did not have the burden of proof at trial, the appellant must demonstrate that there is insufficient evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Am. Interstate Ins. Co. v. Hinson*, 172 S.W.3d 108, 120 (Tex. App.—Beaumont 2005, pet. denied). When reviewing a factual sufficiency challenge, we consider and weigh all the evidence in support of and contrary to the jury's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We set aside a finding only if it "is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985).

**Common Law Fraud**

To prevail on a common law fraud claim, a plaintiff must prove that: (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent the

28

other party would act on it or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on defendant's representation. *See Emerald Oil*, 348 S.W.3d at 217. Dewberry and Font alleged that Bowen and WOLC, Inc. committed fraud by misrepresenting that WOLC was a waterfront community and that residents would have boat access to Lake Conroe via a canal system, which he would maintain until enough lots were sold to turn the canal maintenance over to the POA. They alleged that they relied on the misrepresentations and were induced to buy properties in WOLC. Further, with respect to Dewberry, he alleged that the misrepresentations constituted fraud in a real estate transaction. Finally, they alleged that Bowen individually or on behalf of WOLC continually promised and represented that the canals would be desilted and restored to navigability so they could enjoy the amenities promised when they purchased their properties, and the false promises amount to a continuing fraud.

Dewberry also alleged statutory fraud in a real estate transaction.

> The elements of statutory fraud in a real estate transaction are a: "(1) false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person in entering into that contract; or (2) false promise to do an act, when the false promise is (A) material; (B) made with the intention of not fulfilling it; (C) made to a person for the purpose of inducing that person to enter into a contract; and (D) relied on by that person in entering into that contract."

29

*Grove v. Franke*, No. 09-18-00119-CV, 2019 WL 5243152, at \*3 (Tex. App.—Beaumont Oct. 17, 2019, pet. denied) (mem. op.) (quoting *Flynn v. Keller Williams Inc.*, No. 04-12-00307-CV, 2013 WL 979196, at \*2 (Tex. App.—San Antonio Mar. 13, 2013, no pet.) (mem. op.)); *see also* Tex. Bus. & Com. Code Ann. § 27.01(a). A person who makes the false representation described by the statute commits fraud and is liable to the person defrauded for actual damages. *See* Tex. Bus. & Com. Code Ann. § 27.01(b).

In *Spoljaric v. Percival Tours, Inc.*, the Court explained:

> A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.

708 S.W.2d 432, 434 (Tex.1986) (citations omitted). Failure to perform, standing alone, is no evidence of the intent not to perform when the promise was made, as that fact is a circumstance to be considered with other facts to establish intent. *Id.* at 435; *Texienne Oncology Ctrs., PLLC v. Chon*, No. 09-19-00356-CV, 2021 WL 4994622, at \*5 (Tex. App.—Beaumont Oct. 28, 2021, pet. denied) (mem. op.); *Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*, 249 S.W.3d 480, 489 (Tex. App.—Beaumont 2008, no pet.). "'Material means a reasonable person would attach importance to and would be induced to act on the information in determining his

30

choice of actions in the transaction in question.'" *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Smith v. KNC Optical, Inc.,* 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)).

**Sufficiency of Evidence as to Fraud**

Appellants contend the evidence is legally and factually insufficient to support the jury's findings that Bowen made a material misrepresentation, as a positive assertion knowing it was false, and that he did so with the intent that Dewberry and Font would act on it. The evidence established that WOLC was marketed as a waterfront canal community and that having navigable canals allowed residents to access Lake Conroe. Dewberry and Font asked about the canals and who would maintain them before purchasing their property. Bowen represented that WOLC would maintain the canals to a depth of six feet until enough lots sold that the POA would take over and guaranteed access to Lake Conroe. Both Dewberry and Font explained why they desired waterfront property and navigable canals: for Dewberry, it was having lake access and reaching family members who had homes in neighboring communities on the lake; for Font, it was accessing the lake to use their boat and jet skis. Font testified that he would not need the house if he could not get his boat through the canals with access to the lake. Font said Bowen's statements impacted his decision, he was a "very good salesman," and Font bought the house.

The evidence at trial demonstrated that Bowen had a practice of telling people what he needed to make a sale, knew how expensive maintaining the canals could be, and had problems with the canals in at least one prior development. His employees testified that he purchased a dredger for show, and he never had a maintenance program or had anyone regularly checking depth of the WOLC canals. Employees also testified that Bowen did things to make the canals look appealing to buyers without improving their condition, like removing grass from sandbars and knocking dirt under the water before a big sales weekend, so it was not visible. There was evidence presented to the jury that Bowen had not returned the canals to a navigable state in the years between the Memorial Day flood and trial, despite acknowledging he was responsible for the canals. Following the flood, Bowen told people contradictory things like he was responsible for the canals and would fix them but told others he did not own the canals.

The evidence of Bowen's representations and promises made to Dewberry and Font about the canals, as well as to other buyers, his failure to keep his promises, including his failure to maintain the depth and condition of the canals after promising he would do so, coupled with his other conduct to cover up the shallowness of the canals as outlined above, provided evidence from which a reasonable jury could conclude that he never intended to maintain the navigability of the canals when Bowen made promises to induce Dewberry and Font to buy property within WOLC.

32

*See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."). "Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006) (citation omitted); *see also Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex. 2009) (citations omitted). While breach alone is not evidence of intent, "breach combined with 'slight circumstantial evidence' of fraud" is enough evidence of fraudulent intent to support a verdict. *Aquaplex*, 297 S.W.3d at 775 (quoting *Chapa*, 212 S.W.3d at 305). Such circumstantial evidence includes the parties' conduct after the representation is made and is present in this record. *See id.* (citation omitted).

Viewing the evidence in the light most favorable to the jury's findings, we conclude there is more than a scintilla of evidence to support the jury's finding that Bowen made a material misrepresentation, that he knew was false, and he did so with the intent that Dewberry and Font act on it by purchasing property in WOLC. *See Emerald Oil*, 348 S.W.3d at 217 (setting forth elements of fraud); *Grove*, 2019 WL 5243152, at *3 (outlining elements of statutory fraud in a real estate transaction); *see also Bustamante*, 529 S.W.3d at 456 (discussing standard of review); *Tanner*,

289 S.W.3d at 830 (directing courts to uphold a jury's finding if supported by more than a scintilla of evidence). Thus, the evidence was legally sufficient to support the jury's findings on the first three elements of fraud and statutory fraud. *See Emerald Oil*, 348 S.W.3d at 217; *Grove*, 2019 WL 5243152, at *3; *see also Bustamante*, 529 S.W.3d at 456; *Tanner*, 289 S.W.3d at 830.

As to factual sufficiency and contradictory evidence, Bowen testified that he intended to maintain the canals and purchased the barge to do so. He testified that he could not have foreseen the storms. He also testified the canals were navigable for a time after Dewberry and Font purchased their properties. Bowen also testified the lawsuit interfered with his ability to fix the canals, and he was waiting on the City to repair the bridge and another developer to clean his property upstream. He explained that he still owned about ninety lots in WOLC, and he would benefit if the canals were restored so he could sell the lots as waterfront. Bowen proffered evidence showing that he paid a contractor hundreds of thousands of dollars for work on the canals. Bowen's intentions and whether he genuinely attempted to make repairs to the canals was a disputed fact issue. The jury was free to weigh all the evidence and could have believed some, all, or none of Bowen's testimony. *See City of Keller*, 168 S.W.3d at 819. In considering all the evidence in support of and contrary to the jury's fraud findings, we cannot conclude they are "so contrary to the

overwhelming weight of the evidence as to be clearly wrong and unjust." *See Ellis*, 971 S.W.2d at 406–07; *Dyson*, 692 S.W.2d at 457.

**Evidentiary Sufficiency to Support Damages**

We next turn to the last element for fraud claims, which is harm caused by the misrepresentation. *See Emerald Oil*, 348 S.W.3d at 217; *Grove*, 2019 WL 5243152, at *3. Appellants assert the evidence is insufficient to support that Dewberry and Font were harmed and to support the damages awarded and specifically, that "[t]here was no evidence of any damages caused by Appellants' purported fraud."

Appellants acknowledge that consequential damages are recoverable in certain fraud cases, but argue they are not recoverable here because the harm "caused as a result of the storms" was unforeseeable and not directly traceable to Appellants. "When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable." *Formosa Plastics*, 960 S.W.2d at 49 n.1. The evidence showed that it was not damages caused by the storms that Dewberry and Font claimed, rather it was Bowen and WOLC's failure to maintain the canals in a navigable state and give them access to Lake Conroe, which included returning them to that condition after the storm. The evidence showed that the lots they purchased were no longer characterized as "waterfront" by the Montgomery Central Appraisal District (MCAD) due to the

canals' condition. Unnavigable canals and the resulting damage to property values if proven, would be directly traceable and foreseeable to the fraud. *See id.*

Appellants next complain of the jury's award of out-of-pocket and loss of use damages, but we address only diminution in market value as that is the only measure of damages the trial court's judgment included. In support of this argument, Appellants argue that Appellees failed to properly disclose their opinions under the Property Owner Rule. Appellants also argue Appellees' damages testimony was conclusory and speculative.

"The Property Owner Rule falls under Texas Rule of Evidence 701, which allows a lay witness to provide opinion testimony if it is (a) rationally based on the witness's perception and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012) (citing Tex. R. Evid. 701; *Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 852 (Tex. 2011)). The Property Owner Rule presumes an owner is familiar with his property and its value and is an exception to the requirement that a witness must otherwise establish his qualifications to express an opinion on land values. *Id.* Being subject to Rule 701, a property owner need not be disclosed or designated as an expert to testify about the value of his property. *See id.* (noting Property Owner Rule falls under Rule of Evidence 701, governing lay testimony); *Teal Trading & Dev., LP v. Champee*

36

*Springs Ranches Prop. Owners Ass'n*, 534 S.W.3d 558, 577 (Tex. App.—San Antonio 2017) (agreeing that a property owner "need not necessarily be designated or disclosed as an expert in order to testify about the value of his property"), *aff'd*, 593 S.W.3d 324 (Tex. 2020).

Bowen and WOLC's argument that they failed to properly designate Dewberry and Font as experts lacks merit. The record reflects that in August 2019, about six months before trial, the Plaintiffs filed their Supplemental Responses to Requests for Disclosure. The Supplemental Responses listed both Plaintiffs as persons with knowledge of relevant facts and claimed diminution in property values as a measure of damages. *See* Tex. R. Evid. 701; *see also Justiss*, 397 S.W.3d at 157; *Teal Trading*, 534 S.W.3d at 577.

We now turn to Appellants' contention that Appellees' testimony was too conclusory and speculative, thus insufficient to support the damages awarded. Testimony provided under the Property Owner Rule serves the functional equivalent of expert testimony and must be judged by the same standards. *Justiss*, 397 S.W.3d at 159. An owner's property valuations may not be based solely on their *ipse dixit. See id.* An owner must provide the factual basis for his opinion and not simply use the phrase "market value" with a number to substantiate a diminished value claim. *See id.*; *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 579–80 (Tex. App.—Beaumont 2008, pet. denied) (concluding that property owner's testimony he

37

arrived at post-flood value of his home by "pulling [it] out of the air[,]" was too speculative to support estimated damages). Considering the resources available today, "[t]his burden is not onerous." *Justiss*, 397 S.W.3d at 159. "Evidence of price paid, nearby sales, tax valuations, appraisals, online resources, and any other relevant factors may be offered to support the claim." *Id.*

The jury determined that the diminution in market value of Dewberry's property was $142,000. Dewberry testified that he purchased his lot in 2008 for $123,900 and later spent $390,000 to build the home. He also paid $40,000 for an outdoor patio and $7,000 for a wrought iron fence.

Dewberry and Daniel Lauw both testified that in March 2016, shortly before the flood, Dewberry entered into a lease purchase agreement with Lauw, who agreed to pay $430,000 for the home, and he paid a lump sum of $30,000 to rent the home for a year before buying it. At that time, the canals were navigable to Lake Conroe. The evidence showed that Lauw had a boat and was interested in access to Lake Conroe, and he testified that navigability of the canals was "[e]xtremely" important to him. Dewberry also testified that after the canals silted in, Lauw backed out of the purchase but leased the home for another year at a reduced price. After the canals were silted, Lauw renewed the lease and "tried to wait it out" with the intention that if the property was "fixed," he would buy it. Lauw testified that he ultimately decided not to purchase Dewberry's home since the issue with the canals was

38

unresolved, and it was not worth what it was before. In 2013 when the canals were navigable, Dewberry listed the home for $479,000, but he testified that the price reflected his need to sell due to his divorce, and he did not receive any offers at that time, so he removed it from the market.

Dewberry testified that since the canals occluded, MCAD reduced the value of his property to $300,000. Dewberry also explained that he consulted a realtor on comparable sales in WOLC and was advised that after the flood, homes were being sold for $106 per square foot, and his home was 3,000 square feet, which is how he arrived at $318,000. Dewberry considered the devaluation of unimproved lots in WOLC after the flood, which have been reduced from the mid $130,000's to $69,000. Dewberry ultimately opined that the current market value of his home was $318,000. In arriving at that value, he explained that he considered the MCAD valuation of $300,000, the realtor's input that comparable homes were selling for $106 per square foot, the fact that Lauw backed out of a contract to buy the home for $430,000 before the canals became unnavigable, and the fact that WOLC lot values have been cut in half. To support his damages, Dewberry testified about what he paid, sales in WOLC, a realtor's information, MCAD valuations, and the fact that a prospective buyer backed out of a contract due in part to unnavigable canals. *See Justiss*, 397 S.W.3d at 159 (discussing types of evidence that may support a property owner's valuation).

The jury awarded Font $60,000 for diminution in market value. Font testified that as the property owner, he is familiar with the value. He testified that if he sold his lot currently, the fair market value would be below $65,000, but if the canals were in working order, it would probably be $130,000. Font described the information he used to arrive at that opinion, including a comparable analysis on surrounding lots that real estate broker Melissa Seureau performed. Font testified that information included two lots in the neighborhood listed for $139,000 but were on the market for $75,000 but still had not sold. Additionally, Font testified that the tax appraisal value for his lot had been reduced from $130,000 to $75,000.

Font testified that the fair market value of his house was probably $315,000, but he invested $560,000 in the house with the outdoor kitchen and upgrades to the boat lifts. He said that houses in the neighborhood the same size as his with swimming pools are listed currently with the unnavigable canals at $330,000 and $360,000. He explained that the information he used to arrive at his opinion included data Seureau provided "on the comps and I compared them," and he considered the current MCAD value of $300,000. Font said that the comparable properties had swimming pools and were on the same canal as his, and one was 3,500 square feet and the other was 3,600 square feet; his home is 3,475 square feet. The information Seureau provided in June 2019 indicated the homes in WOLC were not selling but listed at $116 per square foot. He also testified his home "was worth 512,000 when

40

I purchased it." Font testified that Dewberry lives next door to him, and his lot is similar in size and dimensions. Likewise, Font's evidence to support his opinions of market value included tax values, comparable sales listings, a real estate broker's analysis, and the amount he paid for his property and upgrades. *See id.*

Real estate broker Seureau also testified about her analysis of Font's properties. When Seureau showed the Fonts the house in WOLC, there was "lots of water in the canal," but since the canals silted up, the MLS listings for homes in WOLC had the "waterfront portion" removed. Seureau testified that she would not be comfortable currently listing the Fonts' home as waterfront, because it would "create a liability" for her "because there is no waterfront." Seureau said the Fonts paid $512,000 for their home plus upgrades.

Seureau also listed the vacant lot the Fonts' owned next to their home, but it never sold. She described her efforts to market the lot, which included removing the waterfront information in the MLS. She thought the Fonts listed the lot in 2015 and removed it in 2016, after the canals silted up. Seureau testified that nobody paid her for her testimony, and she is not currently listing anything for the Fonts.

We conclude the testimony as outlined above provided a factual basis to support Appellees' diminution of fair market value opinions. *See id.* Having presented more than a scintilla of evidence to support their damages, we conclude the jury's findings on diminution in value as to both Font and Dewberry were

41

supported by legally sufficient evidence. *See Tanner*, 289 S.W.3d at 830; *Herrera*, 631 S.W.3d at 451; *see also Gicor, Inc. v. Brewer*, No. 09-21-00222-CV, 2023 WL 4781217, at *14 (Tex. App.—Beaumont July 27, 2023, no pet.) (mem. op.) (discussing expert testimony in property valuation case and concluding testimony constituted "more than a scintilla of evidence to support the damages"). Additionally, after considering all the evidence supporting and contradicting the jury's damages findings, we cannot conclude they are "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *See Ellis*, 971 S.W.2d at 406–07; *Dyson*, 692 S.W.2d at 457. Therefore, the evidence as to damages is factually sufficient.

We overrule Appellants' fifth issue.

## CONCLUSION

Having overruled each of Appellants' issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on October 26, 2023
Opinion Delivered December 14, 2023

Before Golemon, C.J., Johnson and Wright, JJ.